434 S.E.2d 319 (1993)
Demetris THOMAS
v.
COMMONWEALTH of Virginia.
Record No. 0420-91-1.
Court of Appeals of Virginia.
August 3, 1993.
Rehearing En Banc Granted September 13, 1993.
*320 James B. Covington, Norfolk (Breeden, MacMillan & Green, on briefs), for appellant.
Eugene Murphy, Asst. Atty. Gen. (Mary Sue Terry, Atty. Gen., on brief), for appellee.
Present: BENTON, KOONTZ[*] and BRAY, JJ.
BRAY, Judge.
Demetris Thomas (defendant) was convicted of statutory burglary, attempted *321 rape, malicious wounding and aggravated sexual battery and was sentenced in accordance with the jury's recommendation to thirty-five years imprisonment. On appeal, defendant complains that he was unlawfully arrested and that the trial court erred in admitting certain impeachment evidence, his statement to police and a "tainted" identification. For the reason stated below, we reverse and remand.
Upon appeal from a trial court's ruling on a motion to suppress, we must view the evidence in the light most favorable to the prevailing party, granting to it all reasonable inferences fairly deducible therefrom. Commonwealth v. Grimstead, 12 Va.App. 1066, 1067, 407 S.E.2d 47, 48 (1991); Reynolds v. Commonwealth, 9 Va. App. 430, 436, 388 S.E.2d 659, 663 (1990). The findings of the trial court will not be disturbed unless "plainly wrong," Grimstead, 12 Va.App. at 1067, 407 S.E.2d at 48, and the burden is upon the appellant to show reversible error. Reynolds, 9 Va. App. at 436, 388 S.E.2d at 663.
The evidence disclosed that, on February 20, 1990, Sandra Harris (Harris) was awakened in her home between 4:00 and 5:00 a.m. by "somebody touching [her] chest ... inside [her] shirt." When she realized that a "guy ... with a porcelain face mask on" was "leaning on top of [her]," holding "a knife to [her] throat," Harris "started fighting him" and "he cut [her]" hand. She then promised not to "scream," and the intruder "put the mask on top of his head," allowing Harris to "look directly into his face ... about a minute." In an effort to escape, Harris "ran to the front door," and the assailant "jumped out of the window and took off."
Shortly thereafter, Officer Thomas Scotting (Scotting) "received a call to assist another unit" in response to a "stabbing" at a nearby "location." A description of the "suspect" was transmitted to Scotting and, "while checking the area," he observed defendant "come from around the back side ... of [a] motel." Scotting viewed this conduct as "suspicious" because there were "no rooms back there" or "anything leading to that area of the motel." He also noted that defendant "matched" the description of the suspect and was alone on the street. Scotting entered the motel office, followed by defendant, who requested a cab and "walked out." When Scotting turned to follow, defendant had "disappeared."
Scotting continued to patrol the area and saw defendant "coming out of the shadows" as a taxi approached. Defendant walked in the direction of the patrol car and Scotting "asked him to come over ... a foot or two" to his "unit." He advised defendant that police were searching for a person of his description, "frisked" him for weapons and inquired "if he would voluntarily go to a showup at a particular location." Defendant agreed, after Scotting assured him that the police would return him "to catch his cab," provided "nothing transpired." Although Scotting testified that defendant was not under arrest, he was handcuffed and transported in the rear seat of the vehicle "about a quarter of a block" to Harris' residence.
On arrival, Harris "walk[ed] out to the police car," "looked at [defendant's] face," and "told [police] that it was him." However, she "wanted to make sure [she] wasn't falsely accusing somebody" and "asked to see him standing up," to "look at his body size." Defendant, still handcuffed, was then "walked ... up ... [the] sidewalk" by a police officer, and Harris confirmed that she was "absolutely sure," "positive that it was him." She again identified the defendant at the preliminary hearing, the suppression hearing and trial.
Following Harris' initial identification, defendant was arrested and taken into custody and, after being "advised of his legal rights," was interviewed by Officers Dunn (Dunn) and Dickerson (Dickerson). During this questioning, defendant admitted that he had entered Harris' home, taken "a knife out of her drawer" and "thought about ... raping her but ... didn't." Dickerson recalled that the interview ended at 2:30 p.m., when defendant indicated that he wished to speak with an attorney.
Defendant was continuously in custody from his arrest on February 20, 1990, until *322 trial on October 31, 1990. A preliminary hearing on the charges was conducted on March 14, 1990, and defendant was indicted on April 4, 1990. Trial was originally scheduled for May 21, 1990, but continued, on defendant's motion, until August 22, 1990.
Defendant testified at trial and denied involvement in the offenses. When the Commonwealth attempted to impeach him with evidence of two prior felony convictions, defense counsel objected, arguing that these convictions were not "final" because defendant "ha[d] not yet been sentenced." The trial court overruled the objection and this evidence was presented to the jury.

I. IMPEACHMENT
Defendant first contends that he was improperly impeached "through the use of ... guilty verdicts prior to sentencing." This Court concluded in Dowell v. Commonwealth, 12 Va.App. 1145, 1149, 408 S.E.2d 263, 265 (1991), aff'd en banc, 14 Va.App. 58, 414 S.E.2d 440 (1992), that a finding of guilty, following a plea of not guilty, does not constitute a conviction for impeachment purposes until memorialized by final order of the trial court. We also found that the admission of such evidence was not harmless because a defendant's credibility becomes "crucial" once he elects to testify. Id. at 1149, 408 S.E.2d at 265-66. "If the jury had believed his testimony, there could have been no conviction." Id. Defendant was, therefore, improperly impeached with evidence of still pending prosecutions, and we must reverse and remand for a new trial.[1]

II. THE SEIZURE
"A `seizure' for purposes of the fourth amendment occurs when the `circumstances... amount to a show of official authority such that a reasonable person would have believed that he was not free to leave.'" Moss v. Commonwealth, 7 Va.App. 305, 307, 373 S.E.2d 170, 171-72 (1988) (quoting Florida v. Royer, 460 U.S. 491, 502, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983)). Under this test, Scotting's detention of defendant clearly constituted a seizure. However, "[t]he Fourth Amendment does not proscribe all seizures, only those that are `unreasonable.'" Bethea v. Commonwealth, 14 Va.App. 474, 476, 419 S.E.2d 249, 250 (1992) (citing Terry v. Ohio, 392 U.S. 1, 9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889 (1968)). To justify the seizure in this instance, Scotting must have possessed "a reasonable and articulable suspicion of criminal activity on the part of the defendant," Commonwealth v. Holloway, 9 Va.App. 11, 15, 384 S.E.2d 99, 101 (1989), based upon "the totality of the circumstances." Wells v. Commonwealth, 6 Va. App. 541, 551, 371 S.E.2d 19, 24 (1988) (quoting United States v. Cortez, 449 U.S. 411, 417-18, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)).
When Scotting observed defendant, he was aware that a serious and violent crime had just occurred in the immediate vicinity. Defendant matched the description of the suspect, was alone on the street less than one block from the crime scene, and was behaving suspiciously. Such circumstances clearly presented sufficient articulable facts to justify Scotting's initial investigatory detention under Terry. See Smith v. Commonwealth, 12 Va.App. 1100, 1103, 407 S.E.2d 49, 51-52 (1991); Wells, 6 Va.App. at 552, 371 S.E.2d at 25.
However, even if this initial encounter was permissible, defendant contends that the ensuing detention, during which he was handcuffed, placed in a patrol car and transported to the victim's home, enlarged the scope of investigative activity into an arrest without probable cause. We disagree.
Although we recognize that "`police procedures [during a Terry stop] can ... be so intrusive ... as to trigger the full protection of the Fourth and Fourteenth Amendments,'" DePriest v. Commonwealth, 4 *323 Va.App. 577, 586, 359 S.E.2d 540, 544 (1987) (quoting Hayes v. Florida, 470 U.S. 811, 815-16, 105 S.Ct. 1643, 1646, 84 L.Ed.2d 705 (1985)), cert. denied, 488 U.S. 985, 109 S.Ct. 541, 102 L.Ed.2d 571 (1988), there is no "`litmus-paper test for distinguishing... when a seizure exceeds the bounds of an investigative stop.'" Id. (quoting Royer, 460 U.S. at 506, 103 S.Ct. at 1329). The Supreme Court has instructed that, in "`evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria.'" Id. (quoting United States v. Sharpe, 470 U.S. 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985)). While the "investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time," the "scope of the intrusion permitted will vary [with each case]." Royer, 460 U.S. at 500, 103 S.Ct. at 1325.
In this instance, the transportation of defendant less than one block for an immediate showup did not transform the initial detention into an arrest. Transportation of a suspect a short distance for possible identification has consistently been found reasonable and consonant with Fourth Amendment safeguards. See State v. Mitchell, 204 Conn. 187, 527 A.2d 1168, 1172-74 (Conn.), cert. denied, 484 U.S. 927, 108 S.Ct. 293, 98 L.Ed.2d 252 (1987); Buckingham v. State, 482 A.2d 327, 334 (Del.1984); Wilkerson v. United States, 427 A.2d 923, 925-26 (D.C.), cert. denied, 454 U.S. 852, 102 S.Ct. 295, 70 L.Ed.2d 143 (1981); People v. Lippert, 89 Ill.2d 171, 59 Ill.Dec. 819, 823-26, 432 N.E.2d 605, 609-12, cert. denied, 459 U.S. 841, 103 S.Ct. 92, 74 L.Ed.2d 85 (1982); People v. Kincy, 106 Ill.App.3d 250, 62 Ill.Dec. 33, 37-38, 435 N.E.2d 831, 835-36 (1982); People v. Hicks, 68 N.Y.2d 234, 508 N.Y.S.2d 163, 167-68, 500 N.E.2d 861, 865-66 (1986); State v. Wheeler, 108 Wash.2d 230, 737 P.2d 1005, 1007-08 (Wash.1987). Moreover, the trial judge made a specific finding that defendant "said he would not mind" accompanying Scotting to the victim's residence.
The use of handcuffs during this phase of the investigation does not alter our analysis. Brief, complete deprivations of a suspect's liberty, including handcuffing, "do not convert a stop and frisk into an arrest so long as the methods of restraint used are reasonable to the circumstances." United States v. Crittendon, 883 F.2d 326, 329 (4th Cir.1989); see also United States v. Moore, 817 F.2d 1105, 1108 (4th Cir.1987), cert. denied, 484 U.S. 965, 108 S.Ct. 456, 98 L.Ed.2d 396 (1987); United States v. Kapperman, 764 F.2d 786, 790 n. 4 (11th Cir.1985); United States v. Bautista, 684 F.2d 1286, 1289 (9th Cir. 1982), cert. denied, 459 U.S. 1211, 103 S.Ct. 1206, 75 L.Ed.2d 447 (1983). Here, it was "dark," and Scotting, alone, was briefly detaining and transporting an individual suspected of involvement in a serious, violent and recent crime. Under such circumstances, Scotting's caution was justified and prudent, and his use of handcuffs was not unreasonable.
Moreover, the record discloses that defendant was advised of the specific, limited purpose of the detention and assented to the identification procedure proposed by Scotting. When he agreed to cooperate, defendant also implicitly consented to those limited intrusions upon his personal liberties reasonably related to the transportation and showup. Handcuffs, like the unavoidable restraint of travel in the moving vehicle, were only incidents of the investigatory activity.
The record thus discloses that police "`diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.'" DePriest, 4 Va.App. at 587, 359 S.E.2d at 545 (quoting Sharpe, 470 U.S. at 686, 105 S.Ct. at 1575); see also Limonja v. Commonwealth, 8 Va.App. 532, 542, 383 S.E.2d 476, 482 (1989), cert. denied, 495 U.S. 905, 110 S.Ct. 1925, 109 L.Ed.2d 288 (1990). Such detention was neither unreasonable nor conducted under circumstances that constituted the functional equivalent of an arrest.

*324 III. THE CONFESSION
Review on appeal of the voluntariness of a statement requires an "independent examination" of "`the totality of all the surrounding circumstances'" to ascertain if it was "the `product of an essentially free and unconstrained choice by its maker,' or whether the maker's will `has been overborne and his capacity for self-determination critically impaired.'" Wilson v. Commonwealth, 13 Va.App. 549, 551, 413 S.E.2d 655, 656 (1992); Gray v. Commonwealth, 233 Va. 313, 324, 356 S.E.2d 157, 163 (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 225-26, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973)), cert. denied, 484 U.S. 873, 108 S.Ct. 207, 98 L.Ed.2d 158 (1987). Nevertheless, "subsidiary" factual findings by the trial court are "entitled to a presumption of correctness." Gray, 233 Va. at 324, 356 S.E.2d at 163.
In the instant case, Dunn testified that he "read each and every question along with" defendant and that defendant appeared to "understand the rights." Dickerson noted that defendant "seemed very willing, if not relieved, to talk ... about the events that had occurred," "was very cooperative" and wanted "to tell everything." Although defendant claims that his statement "wasn't voluntary" because he invoked his right to counsel immediately after executing the form and was told that "a black man cannot win a rape case against three white women in Virginia," the trial court found his testimony "outrageous" and "not credible," concluding that the "statement was at every point carefully taken" from defendant.
Our independent review of the totality of the circumstances confirms that defendant's statement was given freely and voluntarily. The evidence discloses that he was "fully cognizant of his situation, was in control of his cognitive powers, understood the circumstances, and was exercising his free will when he admitted his involvement in the crime." Wilson, 13 Va. App. at 554, 413 S.E.2d at 658. The trial court, therefore, properly denied the motion to suppress the statement.

IV. THE IDENTIFICATION
To determine "whether a particular identification is reliable" and to evaluate "`the likelihood of misidentification,'" we must consider
the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.
Townes v. Commonwealth, 234 Va. 307, 331, 362 S.E.2d 650, 663 (1987) (quoting Neil v. Biggers, 409 U.S. 188, 199-200, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972)), cert. denied, 485 U.S. 971, 108 S.Ct. 1249, 99 L.Ed.2d 447 (1988); Delong v. Commonwealth, 234 Va. 357, 367, 362 S.E.2d 669, 674 (1987), cert. denied, 485 U.S. 929, 108 S.Ct. 1100, 99 L.Ed.2d 263 (1988).
Harris testified that she looked "directly" at defendant's face for "about a minute" during the attack, her initial description of the assailant was accurate, and she manifested a high level of certainty throughout all subsequent confrontations with defendant. At both the showup and preliminary hearing, Harris testified that she was "definite it was him," and she was "positive" in her identification at trial. Finally, only ten minutes separated the crime from the showup, and less than one month passed between the offense and the preliminary hearing.
Defendant's contention that the objectivity of the showup was compromised because he was then handcuffed is without merit. In Delong, the Supreme Court approved the trial court's refusal to suppress eyewitness identification when the defendant was handcuffed, finding the identification "uncontestably reliable." 234 Va. at 366-67, 362 S.E.2d at 674-75. The reliability of Harris' identification is similarly compelling in this case.
We are also not persuaded by defendant's argument that the preliminary hearing identification was unduly suggestive because he was "the only person in the *325 room dressed in jail garb." In Townes, the accused claimed that a preliminary hearing identification under similar circumstances had tainted a subsequent in-court identification. 234 Va. at 331, 362 S.E.2d at 663-64. However, the Court found the earlier incident "insufficient" to discredit the subsequent identification. Id.
Finally, Harris' knowledge that defendant had confessed prior to the preliminary hearing also did not taint the identification process. She had previously unequivocally identified defendant and attributed that testimony to "what [she] recalled" from "the night [of] the incident." McCary v. Commonwealth, 228 Va. 219, 232-34, 321 S.E.2d 637, 644-45 (1984).
Viewing the totality of these circumstances, we conclude that the reliability of Harris' identification was well established, without any substantial likelihood of misidentification, and that the trial court properly refused to suppress this evidence.

V. SPEEDY TRIAL
Code § 19.2-243 requires that the trial of an incarcerated accused commence within "five months after a general district court finds probable cause to believe that the defendant has committed a crime." Shearer v. Commonwealth, 9 Va.App. 394, 399, 388 S.E.2d 828, 830 (1990). Absent satisfactory explanation by the Commonwealth for delay extending beyond the statutory period, the prosecution will be dismissed. Id. However, delay which is attributable to the defendant "will not be counted in determining whether the Commonwealth complied" with the statutory mandate. Id.; Code § 19.2-243(4).
In the instant case, 231 days elapsed between defendant's preliminary hearing on March 14, 1990 and his trial on October 31, 1990. Of these, 93 days resulted from an order, entered on defendant's motion, which continued the original trial date from May 21, 1990 to August 22, 1990. When this period of time is properly excluded from computation, defendant's trial was commenced within 138 days of the hearing, in compliance with statute. Code § 19.2-243.
Defendant insists, however, that this continuance order related only to charges involving an unrelated offense and victim, Sherry Dickinson (Dickinson).
In "assessing responsibility for delay in trying a defendant," we must "confine our review to the record." Godfrey v. Commonwealth, 227 Va. 460, 464, 317 S.E.2d 781, 783 (1984). "Representations of counsel, or even of the trial judge, if not supported by the record, are insufficient. Memories are too fragile to supply authoritatively what the record fails to reveal." Id. Thus, continuances "must be documented to enable us to review and evaluate them when they are challenged." Id. Furthermore, "[w]here a defendant does not object to the accuracy of an order within 21 days after its entry, an appellate court may `presume that the order, as the final pronouncement on the subject, rather than a transcript that may be flawed by omissions, accurately reflects what transpired.' " Kern v. Commonwealth, 2 Va. App. 84, 88, 341 S.E.2d 397, 400 (1986) (quoting Stamper v. Commonwealth, 220 Va. 260, 280-81, 257 S.E.2d 808, 822 (1979), cert. denied, 445 U.S. 972, 100 S.Ct. 1666, 64 L.Ed.2d 249 (1980)).
The continuance order in issue referenced charges then pending on both the Harris and Dickinson indictments, without limitation to either case. On the date of its entry, these offenses had not been severed for trial, shared the same docket number and were lodged in a common file. Moreover, assuming, as defendant argues, that only the Dickinson indictments were scheduled for trial on May 21, the record discloses that, "by agreement between the Commonwealth and the defense," continuance of the Dickinson charges necessitated a continuance of the Harris cases.
The Commonwealth, therefore, adequately explained the delay between May 21, 1990 and August 22, 1990 as attributable to defendant and the trial court properly denied the motion to dismiss.
Accordingly, defendant's convictions are reversed for the foregoing reason and the *326 case is remanded for a new trial, if the Commonwealth be so advised.
Reversed and remanded.
BENTON, Judge, concurring and dissenting.
I concur in Part I and the reversal and remand for a new trial. In addition, however, I would hold that the trial judge erred in denying the suppression motions.

I.
The evidence proved that Demetris Thomas was arrested without probable cause when he was detained by Officer Scotting. "[A]t some point in the investigative process, police procedures can qualitatively and quantitatively be so intrusive with respect to a suspect's freedom of movement and privacy interests as to trigger the full protection of the Fourth and Fourteenth Amendments." Hayes v. Florida, 470 U.S. 811, 815-16, 105 S.Ct. 1643, 1646, 84 L.Ed.2d 705 (1985). The majority opinion recognizes that Thomas was seized. The evidence in this case proved, however, that without probable cause the police detained Thomas to a degree that was the functional equivalent of an arrest.

Terry and its progeny ... created only limited exceptions to the general rule that seizures of the person require probable cause to arrest. Detentions may be "investigative" yet violative of the Fourth Amendment absent probable cause. In the name of investigating a person who is no more than suspected of criminal activity, the police may not carry out a full search of the person or of his automobile or other effects. Nor may the police seek to verify their suspicions by means that approach the conditions of arrest.
Florida v. Royer, 460 U.S. 491, 499, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983) (citations omitted). In determining whether an arrest has occurred, "[t]he only relevant inquiry is how a reasonable person in the suspect's position would have understood his situation." Berkemer v. McCarty, 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984).
The evidence proved that following the assault on the victim in her apartment, Officer Scotting began checking the area in the vicinity of the apartment. He testified that while he was checking the area, he received a description of the suspect as a "black male, five foot seven to five foot nine with slight mustache." As Scotting approached a motel to make an inquiry of the clerk, he saw Thomas come from an area behind the motel and walk toward the motel's office. Scotting did not stop Thomas or ask him any questions. Scotting said he went into the motel office and asked whether the clerk had seen a man "running toward the back of the motel." Thomas, who lived nearby, entered the motel office and asked the clerk to call a taxi cab to take him to work. Scotting testified that he observed that Thomas wore a white pullover shirt with an orange stripe across the chest. He also noted that Thomas wore black stone washed jeans and black hightop tennis shoes. Although Scotting testified at trial that he thought it suspicious that Thomas was there, he also testified that he did not approach Thomas or examine Thomas' face to check whether he had a slight mustache. Indeed, when Scotting arrived at the motel he saw no reason to stop Thomas, even though he was searching for a suspect. Thomas was not suspicious to him. Although Scotting testified that he did not stop Thomas, he testified that when he left the motel after Thomas made his request, Thomas was gone.
The motel clerk testified that between 4 and 5 a.m. she saw ten or twelve police cars down the block from the motel. She testified that a policeman later came into her office and asked if she had seen a "tall black male wearing a Christmas tree-looking shirt." Scotting testified, however, that he did not have a description of the suspect's clothing when he went to the motel. The notes he used at trial also indicate that he had no clothing description when he went to the motel. He denied telling the clerk that he was looking for a tall black male, and he could not recall asking about clothing or a "Christmas tree *327 shirt."[2] The clerk testified that Thomas was in the motel talking to her about calling a taxi cab at the same time the officer arrived. The clerk said that before she could respond to the officer, his radio came on and he left. She said the officer saw Thomas in the motel but did not question him.
The clerk further testified that after she called the taxi cab, Thomas left the lobby and waited outside the motel. She saw him standing near the motel until his taxi cab arrived. She also testified that when the taxi cab arrived, "a police car pulled in front of the cab and one behind the cab and a policeman walked over to [Thomas] and grabbed his arm and they walked him over to the police car."
Scotting testified that after he left the motel he received no additional description of the suspect. He further testified that as he searched the area he saw Thomas by an apartment building adjacent to the motel and near a telephone. Scotting said he drove over to Thomas and stationed himself in Thomas's path as the taxi cab arrived and that Thomas walked toward his police vehicle. Scotting said that at that time he felt Thomas was a suspect because of his suspicious presence and his physical characteristics. Scotting testified that he stopped Thomas, advised him that they were "looking for someone in the area," made him put his hands on the police car, and searched him. He said Thomas protested but then agreed to go to a showup.
Scotting's notes related only that Scotting "approached the suspect and took him into custody." His notes do not state that Scotting asked Thomas to go to the victim's house or that Thomas volunteered to go. The notes state, "I proceeded to him and placed him in the back seat of my unit and transported [him]". Scotting testified that after he told Thomas he was looking for a black male fitting Thomas's description and asked Thomas to put his hands on the car for a search, Thomas protested. His notes state that "at the time of the apprehension Mr. Thomas stated to me `Are you guys grabbing the first black guy you see?'" Scotting could not recall putting handcuffs on Thomas. He testified, however, that Thomas was in custody and was under apprehension. He explained: "When I put handcuffs on someone, put them in the back seat of the car, tell them they are under arrest that's an apprehension." He believed that he had probable cause to arrest Thomas because of Thomas's physical description. However, when he stopped Thomas he had received no clothing description that he could recall.
Thomas testified that he lived near the motel and was trying to get a taxi cab to get to work. He testified that he entered the motel office at the same time Scotting did, and he asked the clerk to call a taxi cab. While he was waiting near the motel for the taxi cab, another officer approached him and asked him whether he had seen a man with Christmas tree shirt. Indeed, the *328 notes Scotting took immediately after the incident state that another officer had stopped a man and released him.
Thomas said that when the taxi cab arrived Scotting stopped him, asked for his identification, and told him to put his hands on the car. He said Scotting then searched him, put handcuffs on him, and put him in Scotting's automobile.[3] Thomas said that Scotting then told him that he was taking him somewhere for an identification.
The evidence does not support a finding that this was an investigative detention. "The mere fact that [Thomas] was not told he was under arrest, was not `booked,' and would not have [been arrested] if the [showup] had proved fruitless, while not insignificant for all purposes, obviously do not make [Thomas's] seizure even roughly analogous to the narrowly defined intrusions involved in Terry and its progeny." Dunaway v. New York, 442 U.S. 200, 212-13, 99 S.Ct. 2248, 2257, 60 L.Ed.2d 824 (1979); see also London v. State, 540 So.2d 211, 213 (Fla.Ct.App.1989).
The officer did not make any inquiries of Thomas. Scotting's notes state that he "parked [his] police unit and approached the suspect taking him into custody." Scotting testified:
I asked him to come over by my police unit, which is within a foot or two of where we were, and advised him we were looking for a black male fitting his general description. I didn't advise him of anything else. I asked him to put his hands on the car for a weapon search.
Thomas protested, stating, "What are you just grabbing the first black guy you see?" Scotting searched him, put handcuffs on him, and put him in the back seat of the car. The notes contain no reference to a discussion or to a request that Thomas go to a place to be identified as a participant in a crime. The notes merely state, "I then transported Mr. Thomas to the crime scene." In response to the question, "He was in custody and was under apprehension?," Scotting said, "Yes." He further stated that "[a]n apprehension is when I have actually put my hands on you and advised you that you are under arrest."
Thomas testified that the officer did not speak to him, except to ask for identification and then ordered him to place his hands on the car. He said Scotting then searched him and handcuffed him. Scotting's notes do not indicate that Scotting spoke to Thomas before searching him and putting handcuffs on him. Officer Scotting and Thomas agree that Thomas protested, saying, "What are you guys doing grabbing the first black guy that you see." Thomas also testified that after he was handcuffed and put in the car, Scotting said, "I just want you to go somewhere with me." Thomas testified that he was not asked to consent to the procedure and did not consent.
Conduct can constitute an arrest. It is not necessary for the police to use the word "arrest." In one case, an officer was found to have arrested the suspect when he "pushed [a suspect] against the wall and told him not to move." United States v. Moreno, 897 F.2d 26, 31 (2d Cir.), cert. denied, 497 U.S. 1009, 110 S.Ct. 3250, 111 L.Ed.2d 760 (1990). Thomas was not questioned briefly when he was stopped so as to suggest an investigation. He was told to put his hands on the car, he was searched, he was handcuffed, and he was not informed that he could leave. This was the functional equivalent of an arrest. See United States v. Hatfield, 815 F.2d 1068, 1071 (6th Cir.1987).
The officer's conduct also had the effect of making any later consent involuntary. When Scotting stopped Thomas, he told Thomas that Thomas was suspected of committing an unspecified crime. Thomas was told to put his hands on the car and he was searched. Even though Thomas verbally protested, he was handcuffed. Thomas testified that he was put in the back of *329 Scottings' car and told that he was being taken to another location for an identification. Although Thomas denied giving consent to being transported, Scotting said that Thomas consented to be transported. Even if Thomas consented to be transported, he did so after protest and while handcuffed. Moreover, Scotting never told Thomas that he was free to leave. Thus, at the time Scotting said Thomas consented, Thomas was subjected to "a more serious intrusion on his personal liberty than is allowable on mere suspicion of criminal activity." Royer, 460 U.S. at 502, 103 S.Ct. at 1326-27.
The evidence does not prove a free and voluntary consent. "[T]he State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority." Id. at 497, 103 S.Ct. at 1324. When the uniformed officer told Thomas he was suspected of criminal activity, he made no inquiry concerning Thomas's purpose for being on the street, asked no other questions to dispel his suspicions, searched Thomas, handcuffed Thomas, and asked Thomas to go with him to another location without telling Thomas that he was free to leave, any consent obtained was not freely and voluntarily given. If Thomas consented, that consent was given only after he had protested the intrusion upon his liberty, after he was handcuffed, and after he was put within the confines of the police vehicle. Although Thomas may have agreed to be transported after being handcuffed and placed in the police car, "the detention to which he was then subjected was a more serious intrusion on his personal liberty than is allowable on mere suspicion of criminal activity." Id. at 502, 103 S.Ct. at 1326-27. Thus, "the consent was tainted by the illegality [of the seizure] and was ineffective to justify the [further detention]." Id. at 507-08, 103 S.Ct. at 1329.

II.
Thomas also contends that the identifications were tainted by overly suggestive procedures. The evidence supports that contention.
"The practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned." Stovall v. Denno, 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967) (footnote omitted). On appeal, we must determine whether under the totality of the surrounding circumstances the confrontation "was so unnecessarily suggestive and conducive to irreparable mistaken identification that [Thomas] was denied due process of law." Id.; see also Palmer v. Peyton, 359 F.2d 199 (4th Cir. 1966).
The evidence proved that the police presented Thomas alone to Harris while Thomas was handcuffed in a police car and after telling Harris that they had caught the culprit. "It is hard to imagine a situation more clearly conveying the suggestion to the witness that the one presented is believed guilty by the police." United States v. Wade, 388 U.S. 218, 234, 87 S.Ct. 1926, 1936, 18 L.Ed.2d 1149 (1967). Exigent circumstances did not exist. See Stovall, 388 U.S. at 302, 87 S.Ct. at 1972. The circumstances were such that the police did not have to show Thomas singly to the victim. They could have used identification procedures that were not suggestive. "Regardless of how the initial misidentification comes about, the witness thereafter is apt to retain in his memory the image of the [showup] rather than of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification." Simmons v. United States, 390 U.S. 377, 383-84, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968). See also Moore v. Illinois, 434 U.S. 220, 224-25, 98 S.Ct. 458, 462, 54 L.Ed.2d 424 (1977).
Moreover, prior to the preliminary hearing, the police told the victim that the suspect who was being presented in court had confessed to the crime. The Supreme Court has condemned this type of conduct, stating, "[t]he chance of misidentification is also heightened if the police indicate to the witness that they have other evidence that [the person in the showup] committed the *330 crime." Simmons, 390 U.S. at 383, 88 S.Ct. at 971.
Persons who conduct the identification procedure may suggest, intentionally or unintentionally, that they expect the witness to identify the accused. Such a suggestion, coming from a police officer or prosecutor, can lead a witness to make a mistaken identification. The witness then will be predisposed to adhere to this identification in subsequent testimony at trial.
Moore, 434 U.S. at 224-25, 98 S.Ct. at 462-63.
Later, at the preliminary hearing, another identification procedure was employed that was not only tainted by the previous suggestive showup, but was itself also unnecessarily suggestive. The victim was asked to identify her assailant in a courtroom where Thomas was the only person dressed in jail garb, standing a few feet away next to his lawyer.
The pervasive suggestiveness of the identification procedures far outweighs the factors generally recognized in Neil v. Biggers, 409 U.S. 188, 199-200, 93 S.Ct. 375, 382-383, 34 L.Ed.2d 401 (1972), that are used to determine reliability of the identification.
"`The trial [that] determine[d] the accused's fate [was] not ... that in the courtroom but that at the pretrial confrontation, with the State aligned against the accused, the witness the sole jury, and the accused unprotected against the overreaching, intentional or unintentional, and with little or no effective appeal from the judgment there rendered by the witness`that's the man.'"
Moore, 434 U.S. at 225, 98 S.Ct. at 463 (quoting United States v. Wade, 388 U.S. 218, 235-36, 87 S.Ct. 1926, 1937, 18 L.Ed.2d 1149 (1967)). Harris' opportunity to see and know her assailant were not so clear and certain as to outweigh the significant taint of the suggestive procedures.
Before the Full Court.

UPON A PETITION FOR REHEARING EN BANC
On August 18, 1993 came the appellant, by court-appointed counsel, and filed a petition praying that the Court set aside in part the judgment rendered herein on August 3, 1993 and grant a rehearing en banc thereof.
On consideration whereof, the petition for rehearing en banc is granted, the mandate entered herein on August 3, 1993 is stayed pending the decision of the Court en banc, and the appeal is reinstated on the docket of this Court.
The parties shall file briefs in compliance with Rule 5A:35. It is further ordered that the appellant shall file with the clerk of this Court ten additional copies of the appendix previously filed in this case.
NOTES
[*] When the case was argued, Judge Koontz presided. Judge Moon was elected Chief Judge effective May 1, 1993.
[1] Although we reverse and remand on this issue, we will address the remaining questions as they may reoccur at retrial.
[2] The Commonwealth's evidence at the suppression hearing was doubtful in several respects. At the suppression hearing the officer testified using two and a half pages of notes that were designated as Commonwealth's Exhibit 3. He testified as follows:

Q. Officer Scotting, the notes you used to refresh your recollection, when did you prepare those notes?
A. As soon as I took Mr. Thomas back to the scene and I was notified he was to be transported.
Q. Have you made another set of notes with respect to the same transaction.
A. I don't understand.
Q. Did you make another set of notes that were in connection with the same time that you apprehended Mr. Thomas.
A. I don't recall. These are the notes that came out of my notebook, and I don't recall right at this moment whether I duplicated these for the detective or whether I just rehandwritten them. Sometimes our copier machine doesn't work. These are the notes I write on the scene. These are my notebook paper.
Later a detective informed the court that Officer Scotting had given him another set of notes which were a page and a half in length and marked Commonwealth's Exhibit 4. Scotting then admitted that Exhibit 4 had been written at the scene and that he had prepared Exhibit 3 at some later time to "give me an overall view of what's going on." The notes marked Exhibit 3 were prepared at the detective bureau after Thomas had been delivered to the police department. One set of notes states that Scotting was told that the suspect was seen wearing a woman's red and white night shirt. The other contains no reference to that description.
[3] The victim who was allowed to view Thomas at her residence also stated that Thomas was handcuffed while he was in the automobile. The trial judge, implicitly found he was handcuffed, stating:

I will grant you that usually putting somebody in the back of a police car with handcuffs on is tantamount to arrest.