2008 ND 84

**STATE of North Dakota, Plaintiff and Appellant**

v.

**David GAY, Defendant and Appellee.**

**No. 20070348.**

Supreme Court of North Dakota.

May 15, 2008.

Nicole E. Foster (argued), State's Attorney, Williston, ND, for plaintiff and appellant.

Faron E. Terry (argued), Minot, ND, for defendant and appellee.

KAPSNER, Justice.

[¶ 1] The State of North Dakota ("State") appeals a district court order granting a motion to suppress evidence against defendant, David Gay. We affirm the order of the district court.

I

[¶ 2] On May 3, 2007, the Northwest Narcotics Task Force received a tip claiming that a probationer, Ben Smith, would be selling drugs in Williston, North Dakota. The tip claimed Smith planned to meet with an unknown male driving a black car at Smith's workplace after Smith finished work that day. According to the tip, the unknown male would be coming from New Town, North Dakota. The tip provided the person meeting Smith intended to purchase methamphetamine. This tip was relayed to probation Officers Cote and Haagenson and to several other law enforcement officers. Officer Kvande, from the Williams County Sheriff's Office, was one of the officers who was made aware of the tip, was involved in the investigation, completed a police report, and gave testimony at the suppression hearing. The identity and nature of the tipper was not disclosed in any of the police reports, testimony, or affidavits submitted during the hearing on the motion to suppress.

[¶ 3] Officer Kvande was the only witness called by the State at the suppression hearing to testify regarding the investigation, charging, and arrest of Gay. The district court did not create written findings of fact; instead, the district court explained its legal rationale for its decision, with very limited discussion of specific facts, on the record at the suppression hearing.

[¶ 4] According to Officer Kvande's police report and his testimony at the suppression hearing, several law enforcement officers watched Smith's workplace after receiving the tip and saw another male get into Smith's vehicle with him. Officer Kvande's report states he was called to assist with the investigation at a location several blocks from Smith's workplace after several officers had already stopped Smith's car. Officer Kvande's report and testimony state that when he arrived on the scene, the investigating officers were conducting a probation search of Smith and Smith's vehicle and had handcuffed Smith's passenger, David Gay. Officer Kvande testified one of the officers had already read Gay his *Miranda* rights and had handcuffed Gay for officer safety prior to Officer Kvande's arrival. Officer Kvande's report states that after he arrived, he re-read Gay his *Miranda* rights, kept him handcuffed, and, with Gay's consent, conducted a pat-down search for weapons. Officer Kvande's testimony indicates he believed Gay had already been searched for weapons before Officer Kvande arrived. No drugs, weapons, or other illegal material was found on Gay during Officer Kvande's pat-down. While Officer Kvande did not find any drugs or other contraband on Gay, the officers searching Smith found a large sum of cash in Smith's pocket and what they believed to be methamphetamine paraphernalia in Smith's car. It is unclear from Officer Kvande's testimony or report whether the cash and paraphernalia were found before the first officers at the scene handcuffed Gay.

[¶ 5] Officer Kvande testified he spoke with Gay after the pat-down and the *Mi-*

*randa* recitation while Gay was still hand-cuffed. Officer Kvande testified Gay told him he was not involved in any drug deal, but he had smoked marijuana on the previous day. Officer Kvande testified that at this point, Gay had been in handcuffs for about fifteen minutes. Officer Kvande then placed Gay under arrest for ingestion of a controlled substance.

[¶ 6] Gay brought a motion to suppress his statement, and the district court granted the motion at a pretrial suppression hearing:

> THE COURT: The Court tends to—well, let me point out what I see.
>
> Law enforcement officials have significant authority to stop Mr. Smith, I believe, because of his probationary status. And they apparently thought they had a lead on some illegal activity going on. Um, that alleged illegal activity in and of itself was insufficient for any kind of arrest.
>
> So what we really have is a stop made on authority of a probation search of someone who is not the defendant, and the search of the defendant and others for officer safety. At that point, I can find nothing untoward about the activity of the officers. And had they found something in Mr. Smith's pocket—or Mr. Gay's pocket at that time, I see nothing which would potentially throw out any discovery.
>
> Their basis of dealing with Mr. Gay, however, was protection of the officers. After that had been established that that was not a risk, Mr. Gay continued to be in handcuffs. Which triggers some use of authority that subjects Mr. Gay to certain rights. The mere fact that—well, he was in custody. He was under arrest in effect at that time. He was in handcuffs. And nothing he could do about that. After the basis for him being in handcuffs was eliminated, that is

after the search showed he was not at risk, the police no longer had a unfettered basis for questioning.

> And when you have someone in handcuffs, that is intimidating enough so that merely saying the Miranda warnings did not clear the taint. There was no probable cause for his continued arrest at the time that the questioning occurred.
>
> I am going to grant the motion on that ground.

[¶ 7] The State appeals, arguing the district court erred in suppressing Gay's statements because the search and seizure of Gay was not unreasonable under the United States or North Dakota Constitutions.

## II

### A. Proper Appeal Under N.D.C.C. § 29–28–07(5)

[¶ 8] Gay argues the State has not properly taken its appeal in this case. "The prosecution's right to appeal in a criminal case is strictly limited by statute." *City of Harvey v. Fettig*, 2001 ND 12, ¶ 5, 621 N.W.2d 324 (citing *State v. Norton*, 2000 ND 153, ¶ 5, 615 N.W.2d 531; *State v. Schindele*, 540 N.W.2d 139, 141 (N.D. 1995)). Section 29–28–07(5), N.D.C.C., allows the prosecution to appeal from:

> An order granting the return of property or suppressing evidence, or suppressing a confession or admission, when accompanied by a statement of the prosecuting attorney asserting that the appeal is not taken for purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding. The statement must be filed with the clerk of district court and a copy must accompany the notice of appeal.

"The prosecutor's statement cannot be a mere paraphrase of the statutory lan-

guage, but must have substance." *Fettig,* at ¶ 6 (citing *Norton,* 2000 ND 153, ¶ 5, 615 N.W.2d 531; *Schindele,* 540 N.W.2d at 141). "Prosecutors must support their appeals with an explanation of the relevance of the suppressed evidence." *Id.* "The purpose of the statutory requirement is to ensure that the prosecutor has carefully evaluated the State's case, and the actual effect of the suppression order, *before* filing the notice of appeal." *Id.* (emphasis in original and citations omitted). "The State's right to appeal hinges on a favorable review of the prosecutor's statement by this Court." *Id.* (citing *Schindele,* at 141).

[¶ 9] In *Fettig,* this Court dismissed a prosecutor's appeal, noting the State failed to address both prongs of N.D.C.C. § 29–28–07(5) because "[t]he 'statement' in the prosecutor's affidavit at best merely paraphrases one of the two prongs required by the statute, and fails to outline the specific relevance of and need for the evidence which was suppressed." *Id.* at ¶ 8. The Court also noted the State failed to reference the applicable statute in its notice of appeal. *Id.* at ¶ 7.

[¶ 10] Here, the State does reference N.D.C.C. § 29–28–07(5) and both prongs of the statute in its notice of appeal. The State does not, however, in its notice of appeal or prosecutor's statement, "outline the specific relevance of and need for the evidence which was suppressed." *Fettig,* at ¶ 8. A review of the facts clearly demonstrates the relevance of the evidence suppressed; namely, the statement made by Gay which the lower court suppressed is the only evidence that the State has suggesting Gay ingested a controlled substance. In this case, the relevance of the evidence is plain and would not require explanation. Because the State referenced the appropriate statute, addressed both prongs of the statute, and the relevance of

the suppressed evidence is plain, we allow the State's appeal to proceed.

B. Suppression of Gay's Statements

[¶ 11] When this Court reviews a trial court's ruling on a motion to suppress, we defer to the trial court's factual findings and resolve conflicts in evidence in favor of affirmance. *State v. Guscette,* 2004 ND 71, ¶ 5, 678 N.W.2d 126. Questions of law, however, are fully reviewable on appeal. *State v. Mitzel,* 2004 ND 157, ¶ 10, 685 N.W.2d 120.

[¶ 12] Here, law enforcement stopped a vehicle driven by a probationer, Ben Smith, who was known to and identified by the probation officers who assisted in the investigative stop. As this Court has explained in prior decisions, a probationer's Fourth Amendment rights are limited by the terms of his or her probation. *See, e.g., State v. Hurt,* 2007 ND 192, ¶¶ 18–20, 743 N.W.2d 102; *State v. Krous,* 2004 ND 136, ¶ 19, 681 N.W.2d 822. The stop and search of the vehicle in which Gay chose to ride is not problematic because Gay was riding with probationer Smith, and law enforcement premised the stop on a probation search, which does not require reasonable and articulable suspicion or probable cause, like other stops, searches, or seizures. *Krous,* at ¶ 19. The stop and search of the car itself was not unreasonable under Fourth Amendment standards, even though the record does not otherwise establish a reasonable and articulable suspicion of criminal activity when the vehicle was stopped.

[¶ 13] The law enforcement officers who first arrived at the scene removed Gay from Smith's vehicle, placed him in handcuffs, and conducted a pat-down search for weapons. The State argues, and the district court agreed, that the initial pat-down search of Gay was constitutionally permissible because it was based on officer safety.

[¶ 14] The Fourth Amendment of the United States Constitution, enforceable against the States through the Fourteenth Amendment, prohibits unreasonable searches and seizures. *City of Jamestown v. Dardis*, 2000 ND 186, ¶ 8, 618 N.W.2d 495. "A person may be seized without being arrested." *State v. Heitzmann*, 2001 ND 136, ¶ 9, 632 N.W.2d 1 (citing *State v. Boline*, 1998 ND 67, ¶ 26, 575 N.W.2d 906). "Within the meaning of the Fourth Amendment, a seizure occurs whenever an officer stops an individual and restrains his freedom, and that seizure must be reasonable." *Heitzmann*, at ¶ 9 (citing *State v. Gilberts*, 497 N.W.2d 93, 95 (N.D.1993)). A seizure occurs " '[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen.' " *Boline*, at ¶ 25 (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). "A determination of reasonableness requires balancing the public interest with the individual's right to personal security free from arbitrary interference by police officers." *Heitzmann*, at ¶ 9 (citing *Gilberts*, at 95). The Fourth Amendment speaks to unreasonable searches as well. U.S. Const. amend. IV; *see also* N.D. Const. art. I, § 8 (prohibiting both "unreasonable searches and seizures"). A search, within the meaning of the Fourth Amendment, occurs when "the government intrudes upon an individual's reasonable expectation of privacy." *State v. Dunn*, 2002 ND 189, ¶ 4, 653 N.W.2d 688 (citing *State v. Winkler*, 552 N.W.2d 347, 351 (N.D.1996)).

[¶ 15] "There is no automatic search rule for companions of an arrestee." *Heitzmann*, at ¶ 11 (citing *Wyoming v. Houghton*, 526 U.S. 295, 303, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999); *Ybarra v. Illinois*, 444 U.S. 85, 92–96, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979); *United States v.*

*Menard*, 95 F.3d 9, 11 (8th Cir.1996); *United States v. Flett*, 806 F.2d 823, 827 (8th Cir.1986); *United States v. Bell*, 762 F.2d 495, 498 (6th Cir.1985)). "Rather, a law enforcement officer may conduct a frisk, or a pat-down search, of a person only when the officer possesses an articulable suspicion that an individual is armed and dangerous." *Id.* (citing *State v. Haverluk*, 2000 ND 178, ¶ 22, 617 N.W.2d 652 (internal quotations omitted)). The United States Supreme Court has explained the prerequisites for and the purposes underlying a "frisk" or "pat-down" search:

[T]here must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or "hunch," but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.

*Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (internal citations and footnote omitted).

[¶ 16] It is reasonable for a police officer to request and require that a passenger step out of a vehicle while the officer conducts a search of the vehicle, "even though the passenger ha[s] not violated any traffic laws and [i]s not suspected of committing any crime[;]" however, a frisk or pat-down search of the passenger

requires articulable suspicion that the passenger is armed and dangerous. *See Heitzmann*, at ¶¶ 10–11 (citing *Gilberts*, 497 N.W.2d at 96) (explaining that when law enforcement requires a passenger to exit a vehicle to conduct a search it is constitutionally permissible because when weighing "the minor intrusion on a passenger's liberty in momentarily leaving a vehicle [against the safety of the officers conducting the search], safety predominates"). It was constitutionally permissible for law enforcement to ask Gay to exit the vehicle. While "[a] patdown is not simply a routine preliminary to a more extensive search[,]" *Heitzmann*, at ¶ 13, the district court concluded, based upon the testimony of Officer Kvande, that the pat-down search, along with Gay's initial placement in handcuffs, was warranted and constitutional because of the investigating officers' concerns for safety.

 [¶ 17] The district court found the initial pat-down search and handcuffing was constitutionally permissible, but that the police conduct following the pat-down search was unreasonable under the Fourth Amendment. A seizure occurs " '[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen.' " *Boline*, 1998 ND 67, ¶ 25, 575 N.W.2d 906 (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Here, Gay's liberty was restrained by show of authority and force when law enforcement handcuffed him, and this seizure continued after the purpose of the pat-down had been realized by law enforcement. In *Heitzmann*, we explained:

> An officer is authorized to detain a person for as long as is reasonably necessary to effectuate the purpose of the detention. The right to make an investigatory stop necessarily carries with it

the right to use some degree of physical coercion or threat thereof to effect it, and the test of reasonableness under the Fourth amendment requires careful attention to the severity of the crime, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting the seizure or attempting to evade the seizure by flight. Officers are entitled to use the forcible means reasonably necessary to effectuate the detentive goals of investigation, maintenance of the status quo, or officer safety.

*Heitzmann*, 2001 ND 136, ¶ 18, 632 N.W.2d 1 (internal citations omitted).

 [¶ 18] At the suppression hearing, the district court found Gay was handcuffed for "officer safety" prior to the frisk, but was kept in handcuffs after concerns of officer safety had dissipated. Based upon Officer Kvande's testimony, the district court found that after law enforcement completed the first frisk of Gay, the search of Smith, and the search of Smith's car, none of which produced any evidence of weapons, the continued seizure of Gay, by handcuffing, violated the Fourth Amendment's prohibition against unreasonable seizure, and would warrant the application of the exclusionary rule for any evidence the officers obtained following the unlawful seizure. We agree; the exclusionary rule prohibits the admission of physical and testimonial evidence gathered illegally. *Wong Sun v. United States*, 371 U.S. 471, 484–88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

[¶ 19] Officer Kvande was called to the scene after Gay had been handcuffed, subjected to a frisk, and read his *Miranda* rights for the first time. According to his police report, Officer Kvande "asked [Gay] if [Officer Kvande] could check him for weapons." After the second pat-down search, Officer Kvande left Gay in hand-

cuffs and re-read Gay his *Miranda* rights. According to his report, Officer Kvande "began to question [Gay] about being with Ben [Smith] and the circumstances surrounding the reason that we had stopped their vehicle." Apparently Gay spoke at length about why he was with Smith and then told Kvande "he used marijuana the previous day at his residence in New Town and that he smoked it using a joint." After Gay told Officer Kvande about his use of marijuana, Officer Kvande placed Gay under arrest for ingestion of a controlled substance. The district court found Gay's statements occurred during an illegal seizure and, applying the exclusionary rule to this testimonial evidence, suppressed Gay's statements.

[¶ 20] Because we defer to the district court's factual findings when we review a district court's ruling on a motion to suppress, and Officer Kvande's testimony and police reports support the factual conclusions of the district court, we affirm the order of the district court.

### III

[¶ 21] Gay had twice been made aware of his *Miranda* rights, but was unlawfully seized at the time he made this alleged admission. These facts beg the question of whether a *Miranda* warning, guarding against violations of the Fifth Amendment, is sufficient to dissipate the taint of the ongoing unreasonable seizure, under the Fourth Amendment, making the statement admissible where it might otherwise be suppressed under the exclusionary rule. The interaction between the Fourth and Fifth Amendments was not raised nor argued by the parties on appeal. However, the district court did analyze this issue, finding "merely saying the Miranda warnings did not clear the taint [of the Fourth Amendment violation]." Because the district court spoke to the intersection of the

Fourth and Fifth Amendments in Gay's case, we conclude the trial court's holding was not in error.

[¶ 22] In *Brown v. Illinois,* the United States Supreme Court spoke specifically to the effect of giving *Miranda* warnings following Fourth Amendment violations:

> Although, almost 90 years ago, the Court observed that the Fifth Amendment is in "intimate relation" with the Fourth, the Miranda warnings thus far have not been regarded as a means either of remedying or deterring violations of Fourth Amendment rights. . . . The exclusionary rule, however, when utilized to effectuate the Fourth Amendment, serves interests and policies that are distinct from those it serves under the Fifth. It is directed at all unlawful searches and seizures, and not merely those that happen to produce incriminating material or testimony as fruits. In short, exclusion of a confession made without Miranda warnings might be regarded as necessary to effectuate the Fifth Amendment, but it would not be sufficient fully to protect the Fourth. Miranda warnings, and the exclusion of a confession made without them, do not alone sufficiently deter a Fourth Amendment violation.

> . . . .

> If Miranda warnings, by themselves, were held to attenuate the taint of an unconstitutional arrest, regardless of how wanton and purposeful the Fourth Amendment violation, the effect of the exclusionary rule would be substantially diluted. . . . Any incentive to avoid Fourth Amendment violations would be eviscerated by making the warnings, in effect, a "cure-all," and the constitutional guarantee against unlawful searches and seizures could be said to be reduced to "a form of words."

*Brown v. Illinois,* 422 U.S. 590, 601–02, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) (internal citations and footnotes omitted).

[¶ 23] The United States Supreme Court laid out four factors to consider when determining whether the exclusionary rule should be applied to statements given during or following an unlawful seizure. *Id.* at 604, 95 S.Ct. 2254. The Eighth Circuit Court of Appeals, relying on *Brown,* adopted the following four-prong test to determine whether a *Miranda* warning is sufficient to cure Fourth Amendment violations, making the defendant's statement admissible:

> (1) whether the suspect has been advised of his *Miranda* rights prior to giving his statement; (2) the temporal proximity of his statements to his illegal seizure; (3) the existence of intervening causes between the illegal arrest and the statements; and (4) the purpose or flagrancy of the official misconduct.

*United States v. Reinholz,* 245 F.3d 765, 779 (8th Cir.2001) (citing *Brown,* at 603–04, 95 S.Ct. 2254).

[¶ 24] In applying these factors to the present case, we conclude the district court properly suppressed the statements. The district court found Gay was read his *Miranda* rights, which weighs against suppression. The district court found Gay's statements took place during the unlawful Fourth Amendment activity, which means the temporal proximity of his statements to his unlawful detention weigh in favor of suppression. The district court did not discuss any intervening causes that would dissipate the taint. The district court found that the purpose of the detention was officer safety, but Gay was kept in handcuffs for approximately fifteen minutes, and was not released from handcuffs after officer safety was no longer an issue. The district court ultimately found that giving Gay *Miranda* warnings, to protect

his Fifth Amendment rights, did not dissipate the taint of the ongoing Fourth Amendment violations. Because "we defer to the court's findings of fact and resolve conflicts in the evidence in favor of affirmance[,]" *State v. Guscette,* 2004 ND 71, ¶ 5, 678 N.W.2d 126, and because there is evidence in the record to support the factual and legal conclusions of the district court, Gay's statements were properly suppressed.

IV

[¶ 25] We affirm the order of the district court.

[¶ 26] GERALD W. VANDE WALLE, C.J., and DANIEL J. CROTHERS, JJ., concur.

SANDSTROM, Justice, dissenting.

[¶ 27] At the intersection of the Fourth and Fifth Amendments to the United States Constitution, the majority follows the district court in making a wrong turn. I respectfully dissent.

[¶ 28] The district court suppressed the defendant's statement because he was kept in handcuffs for fifteen minutes, including time after he had been frisked for weapons. I would reverse and remand because the actions of law enforcement were reasonable and the district court misapplied the law. There is no evidence that the handcuffs in any way coerced the defendant into incriminating himself. Even though the defendant testified at the suppression hearing, he offered no testimony of coercion. Indeed, after twice having been advised of his right to remain silent, that anything he said could and would be used against him in a court of law, and that he had the right to an attorney, the defendant made his incriminating statement in the nature of a taunt:

He stated that he used marijuana the previous day at his residence in New Town and that he smoked it using a joint. He stated that if he was to be UA'd that he would test positive for THC. He stated that it is not illegal to smoke the drugs and that there was nothing that we could do about it.

Unfortunately for the defendant, his taunt also reflected his apparent misunderstanding of the law.

[¶ 29] Law enforcement had received a tip of a drug transaction to happen in Williston, specifically that Ben Smith was supposed to be selling a half ounce of methamphetamine to an unknown male coming from New Town, possibly in a black car, and that the unknown male would meet Smith at Smith's place of employment and they would go to a residence for the purchase. Smith's probation officer had advised that he was on probation. Law enforcement "staked out" Smith's place of employment. An unknown male met Smith at his place of employment. The unknown male arrived in a black vehicle registered to a person from New Town—a small North Dakota town. The unknown person and Smith traveled to the residence of Bryce Raad. Smith went into the residence and emerged after about twenty minutes. The officers apparently approached the vehicle with weapons drawn and removed and handcuffed the occupants, Smith and the unknown person. The unknown person was identified as the defendant, David Gay, from New Town. Both Gay and Smith were frisked. No weapons were found on either, but a large sum of cash was found on Smith. The occupant of the residence, Bryce Raad, emerged from the residence and was also outside at the scene of the stop. The stopping officers called for additional law enforcement assistance, apparently before Smith's vehicle was searched. Officers also sought permission to search Raad's

pickup and his garage/shop at the location. The search of Smith's vehicle found methamphetamine paraphernalia and a duffle bag containing a "Whizzinator"—a device used to defeat drug tests.

[¶ 30] Under similar situations, other courts have held that keeping vehicle occupants handcuffed for periods longer than fifteen minutes was reasonable. The U.S. Court of Appeals for the Sixth Circuit said keeping vehicle occupants handcuffed for 35 minutes or even an hour after they had been frisked was reasonable:

> The investigative stop included several steps, all of them reasonably necessary to ensure the officers' safety or to confirm or dispel their suspicions: pulling over the vehicle, forcing the suspects to exit the car, patting down the suspects, physically restraining then questioning them about the events at Chuck's, confirming their identities by completing "field investigation cards," thoroughly searching their car for weapons, and sending and receiving various communications to and from the officers at the crime scene. It is not surprising or disturbing that these steps would together last thirty-five minutes (as the defendants claim) or even an hour (as Houston and Perkins maintain). In either case, we conclude that the officers' inquiries and safety precautions were reasonably related to the initial basis for stopping the car.

*Houston v. Clark County Sheriff Deputy John Does 1–5*, 174 F.3d 809, 815 (6th Cir.1999).

[¶ 31] Despite the testimony that the officers continued the handcuffs for reasons of safety, the District Court held, apparently as a matter of law, that once a defendant had been frisked and no weapons found on his person, handcuffs were unreasonable.

So what we really have is a stop made on authority of a probation search of someone who is not the defendant, and the search of the defendant and others for officer safety. At that point, I can find nothing untoward about the activity of the officers. And had they found something in Mr. Smith's pocket—or Mr. Gay's pocket at that time, I see nothing which would potentially throw out any discovery.

Their basis of dealing with Mr. Gay, however, was protection of the officers. After that had been established that that was not a risk, Mr. Gay continued to be in handcuffs. Which triggers some use of authority that subjects Mr. Gay to certain rights. The mere fact that—well, he was in custody. He was under arrest in effect at that time. He was in handcuffs. And nothing he could do about that. After the basis for him being in handcuffs was eliminated, that is after the search showed he was not at risk, the police no longer had a[sic] unfettered basis for questioning.

And when you have someone in handcuffs, that is intimidating enough so that merely saying the *Miranda* warnings did not clear the taint. There was no probable cause for his continued arrest at the time that the questioning occurred.

I am going to grant the motion on that ground.

The district court's reasoning has been thoroughly rejected by state and federal courts. *See U.S. v. Miller*, 974 F.2d 953, 957 (8th Cir.1992) ("[A] police officer's use of handcuffs can be a reasonable precaution during a *Terry* stop."); *U.S. v. Bautista*, 684 F.2d 1286, 1289–90 (9th Cir.1982) (Initial handcuffing of suspects did not convert investigatory stop into complete arrest where initial handcuffing was not excessive, it was not unreasonable for officer to take adequate protective measures before remaining with two men suspected of unarmed bank robbery, there may have been third robber in the vicinity, and handcuffs eliminated possibility of assault or escape attempt during questioning.); *U.S. v. Taylor*, 716 F.2d 701, 709 (9th Cir.1983) (Handcuffing and frisk of codefendant who was in defendant's truck which was subject of investigatory stop was justified after codefendant had disobeyed order to raise his hands and had made furtive movements inside truck where his hands could not be seen and, further, having codefendant lie down and be handcuffed during frisk did not convert it into an arrest necessitating probable cause.); *U.S. v. Kapperman*, 764 F.2d 786, 791 (11th Cir.1985) (Neither handcuffing nor other restraints will automatically convert a *Terry* stop into a de facto arrest requiring probable cause, for just as probable cause to arrest will not justify using excessive force to detain a suspect, use of a particular method to restrain person's freedom of movement does not necessarily make police action tantamount to an arrest; inquiry in either context is reasonableness.); *U.S. v. Crittendon*, 883 F.2d 326, 329 (4th Cir.1989) (Fact that burglary suspect was handcuffed during frisk did not turn encounter into arrest; officer could anticipate that he might be required to go to aid of fellow officers and that suspect, like his companion, might attempt to flee.); *State v. Munson*, 594 N.W.2d 128, 137 (Minn.1999) ("[B]riefly handcuffing a suspect while the police sort out the scene of an investigation does not per se transform an investigatory detention into an arrest."); *People v. Soun*, 34 Cal.App.4th 1499, 40 Cal.Rptr.2d 822, 831–33 (1995) (Initial seizure of defendant which occurred when police officers stopped car in which defendant was riding was detention, not de facto arrest, for purposes of determining whether warrantless seizure of defendant was constitutional,

even though defendant was removed from car at gunpoint by large number of police officers, forced to lie on the ground, handcuffed, and placed in patrol car; since police officer who initiated detention was aware defendant and others in car were suspects in homicide and were probably armed, police officers were authorized to make "felony stop" of car in order to protect officers' personal safety.); *Thomas v. Com.*, 16 Va.App. 851, 434 S.E.2d 319, 323 (1993) (Brief, complete deprivations of suspect's liberty, including handcuffing, do not convert stop and frisk into arrest so long as methods of restraint used are reasonable to the circumstances.).

[¶ 32] The evidence reflects that law enforcement proceeded reasonably. The detailed tip was borne out in detail. An individual in a black vehicle from New Town arrived at Smith's place of work. Smith and the person then traveled to a residence in Williston. Smith then went inside for twenty minutes. A large sum of money was found on Smith. Initially, there were two unsearched vehicles in immediate proximity, as well as a garage/shop and a residence. Another individual, the occupant of the residence, was then outside. Other officers were called to the scene. The search of Smith's vehicle yielded drug paraphernalia. All this happened in about fifteen minutes. The officer testified that they were concerned about their safety while they tried to sort things out. The district court held that as soon as they frisked the defendant, there was no basis to keep him handcuffed. Whether the officers acted reasonably is a question of law that we review de novo. *State v. Higgins,* 2004 ND 115, ¶ 7, 680 N.W.2d 645. The actions of law enforcement in keeping the defendant handcuffed were wholly reasonable under the circumstances. That he was not armed does not mean the defendant posed no danger. He could have had access to a weapon in either Smith's or Raad's vehicle or in Raad's shop/garage. Further search discoveries could have led to physical action by the defendant.

[¶ 33] Because the district court was mistaken as to the law, the officers acted reasonably, and the principle advanced by the district court and the majority unreasonably imperils officer safety, I would reverse and remand for trial.

[¶ 34] DALE V. SANDSTROM, MARY MUEHLEN MARING.