COURT OF APPEALS OF VIRGINIA

Present: Judges Elder, Annunziata and Frank
Argued at Alexandria, Virginia


LOUIS BROWN, JR.
                                        OPINION BY
v.   Record No. 1225-99-4     JUDGE ROSEMARIE ANNUNZIATA
                                     AUGUST 29, 2000
COMMONWEALTH OF VIRGINIA

          FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
                Herman A. Whisenant, Jr., Judge

        William J. Baker for appellant.

        H. Elizabeth Shaffer, Assistant Attorney
        General (Mark L. Earley, Attorney General,
        on brief), for appellee.


     Louis Brown appeals from his convictions of rape, two

counts of forcible sodomy, abduction with intent to defile, and

attempted abduction with intent to defile.  On appeal, he

contends the trial court erred:  1) in denying his challenges

for cause to jurors Speight and Judd; 2) in overruling his

motion to suppress DNA evidence purportedly obtained as the

result of an illegal arrest; 3) in denying his motion to

suppress evidence purportedly obtained from an illegal search of

his home; 4) in denying his motion to strike the Commonwealth's

evidence on the charge of attempted abduction with intent to

defile; and 5) by refusing to give his proposed instructions D

and E.  For the reasons that follow, we reverse the convictions

and remand for a new trial.

FACTS

"On appeal, we view the evidence in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom." Tibbs v. Commonwealth, 31 Va. App. 687, 691, 525 S.E.2d 579, 581 (2000) (citation omitted). On the evening of July 7, 1998, Y.W. and J.M., two fourteen-year-old girls, were going door to door in a townhouse community on Lynn Street, in Prince William County, selling subscriptions to The Potomac News. Their supervisor, Karen Davenport, drove them to this location, where they were dispatched to sell subscriptions.

Y.W. knocked on the door of Brown's home and inquired whether he wished to purchase a subscription. He invited her inside. Y.W. stood near the door and Brown sat on a couch on the other side of the room. Brown agreed to purchase a subscription, so Y.W. walked across the room, showed him the necessary forms, and accepted his personal check as payment. Brown then got up, walked to the front door, shut and locked it, and said, "You're going to do what I tell you to do." He stood in front of the door and told her to go upstairs. Y.W. became frightened and confused and initially could not move. Brown repeated his command, and Y.W. walked upstairs because she was afraid of what he might do to her if she refused to comply.

Once upstairs, Brown took Y.W. by the arm and led her into a bedroom. He ordered her to remove her shirt. She backed up to a wall and said, "No, God. Please leave me alone. Let me go." Brown walked toward her and again demanded that she remove her shirt. When she refused, he knocked the subscription folder from her hands, grabbed her so that her face was pressed against his chest, and fell with her onto the bed. He said, "Shut up and don't scream and if you do, I'll kill you." She then complied with his order to remove her shirt. Brown grabbed her shorts and tore them as he removed them. He then ordered her to perform oral sex on him, and she reluctantly did so.

After Y.W. submitted to his demand for oral sex, Brown raped her. Afterward, he ordered her to perform oral sex on him again. Brown next performed oral sex on her. Finally, he told Y.W. to get dressed, and he took her into the master bedroom, where he told her to look out the window with him. They could see J.M. sitting on the curb across the street. Brown asked, "Is that your friend out there?" Y.W. answered affirmatively. Brown then took a knife and said, "Come here, don't scream, don't run. Do exactly what I tell you to do." He took her to the front door, stood behind her, pressed the knife against her back, and said, "Call your friend over here." Y.W. hesitated. Brown pushed the knife against her and repeated his command. Y.W. then called J.M. and gestured for J.M. to come to her.

J.M. walked toward the house, opened the screen door, and saw that Y.W. was crying. J.M. asked what was wrong, and Brown told her, "Get in here." J.M. did not comply, and Brown repeated the command as he reached past Y.W. and grabbed the strap of J.M.'s bib shorts. J.M. braced herself against the doorframe and told Brown to release her. The strap of her shorts tore, and Y.W. then saw Brown's knife lifted beside her face, alerting her that he had released his grip on her. Y.W. pushed him aside and stumbled out of the door, knocking J.M. backward as Brown lost his grip on her. The girls fled from Brown's house, returning to Davenport's van, where they reported the attack. Davenport immediately called 911.

Officer Jason Kohl of the Prince William County Police responded to the report. He met Y.W. in the rental office of Brown's townhouse community at 7:25 p.m. and took Y.W.'s description of her attacker. Y.W. also provided Kohl with the signed check Brown had given her, which was imprinted with the name, "Louis Brown." Kohl broadcast the description and name on the police radio.

Officer John Mora was on uniformed bicycle patrol when he received the report of a rape in progress on Lynn Street. He was not in the vicinity when he heard the report, but he and Officer Fall rode to Lynn Street where they met Kohl, who gave

- 4 -

them Y.W.'s description of her assailant. Kohl also showed them the personal check bearing Brown's name.

Mora and Fall set out in search of the suspect. Approximately thirty minutes after hearing the report of the rape, Mora saw a man matching the assailant's description at a pay phone near the intersection of Mary's Way and Constellation Place. When he approached the individual, the man hurriedly walked away. Mora called to him to stop, and, explaining that he was not under arrest, Mora asked the man if he could speak with him concerning a report of a crime that had occurred nearby. In response to Mora's request, the man produced a Virginia identification card bearing the name, "Louis Brown." Mora radioed other officers to come to the scene with a patrol car. He then asked Brown if he would be willing to go to the police station to discuss the incident. Brown agreed. Mora told him again that he was not under arrest and that the police only wanted to speak to him.

Officer Timothy Shaw arrived with a police car to convey Brown to the police station. While en route, Shaw received a request from another officer over the radio for Brown to go to the middle school on Lynn Street for a "show up," so that Y.W. could determine if Brown was the man who attacked her. Brown

consented.  After the show up was completed,[1] Brown was again asked whether he was willing to go to the police station for questioning, and he again gave his consent.

At the police station, Brown was interviewed by Detective Steven Hayhurst.  Detective Hayhurst placed Brown under arrest approximately fifteen minutes after he began interviewing him.  Prior to this time, Brown was free to leave.  The trial court denied Brown's motion to suppress evidence gathered in the course of the investigation prior to his arrest, finding that his contact with the police until that point had been consensual.

Brown was tried on January 29, February 1, 2, and 3, 1999.  The jury found him guilty of rape, abduction with intent to defile, attempted abduction with intent to defile, and two counts of forcible sodomy.  This appeal followed.

### TRIAL COURT'S REFUSAL TO DISMISS JURORS SPEIGHT AND JUDD FOR CAUSE

Brown alleges that the trial court erred by denying his motions to dismiss jurors Speight and Judd for cause.  We agree that the court erred in denying Brown's motion to dismiss Judd, and reverse the convictions on that ground and remand for a new trial.  Because we reverse on that ground, we do not address the court's denial of Brown's motion to dismiss juror Speight.

---

[1] The record does not reveal whether Y.W. identified Brown as her attacker at the show up.

In response to defense counsel's questions on voir dire, Judd stated that she had been the victim of a sexual offense as a child. When counsel asked if that experience could affect her ability to decide the case impartially, she responded, "Possibly." Counsel then asked her whether memories of her own experience could come back to her during the course of the trial and affect her judgment. She responded, "I don't know." The Commonwealth's Attorney later questioned Judd, asking her whether she could put aside her personal feelings to render a fair and impartial verdict. Judd replied, "I don't know." The prosecution then asked, "Do you think it would be impossible for you to sit here and listen" to the evidence and give an impartial verdict. Judd responded, "It would not be impossible." Defense counsel moved to dismiss Judd for cause, on the ground that she acknowledged having been the victim of a sexual offense and could not state that her deliberations on the case would be unaffected by her own experience. The court denied the motion.

In assessing Judd's responses, the court observed that "Ms. Judd . . . was somewhat ambiguous in her answers initially, but . . . she did indicate that she could put [her experience] aside and I think that's about as fair . . . an answer [as] one could get. She didn't say emphatically yes or emphatically no. She said she thought she could." The court thus interpreted Judd's

- 7 -

answer to the Commonwealth's last question as meaning she thought she was able to render an impartial judgment.

In fact, Judd said "[i]t would not be impossible" for her to render an impartial verdict; she did not affirmatively state she believed she could do so.  It is evident from the record that Judd's response was misunderstood by the trial court.  The double-negative construction "not impossible" logically and semantically only means "possible."  "Possible" means an eventuality "that may or may not occur; that may chance; dependent on contingency."  Webster's Third New International Dictionary 1771 (1981); see also Black's Law Dictionary 1166 (6th ed. 1990) ("possible" as denoting improbability).  Judd's statement, premised on possibility, chance, and contingency, provided scant assurance that she was able to render a fair verdict in this case.  At best, her response was ambiguous and equivocal.  As such, it was insufficient as a basis "to dispel the reasonable doubt . . . as to [Judd's] qualifications to serve" as a juror in the case.  Gosling v. Commonwealth, 7 Va. App. 642, 647, 376 S.E.2d 541, 545 (1989) (potential juror's affirmation that "I don't think my impartiality would be affected" by fact that defense witnesses were prison inmates held insufficient to support trial court's determination that juror could render an impartial verdict).  Because "[a]ny reasonable doubt regarding the prospective juror's ability to

give the accused a fair and impartial trial must be resolved in favor of the accused," Sizemore v. Commonwealth, 11 Va. App. 208, 212, 397 S.E.2d 408, 410 (1990), we hold that Judd's response failed to provide a basis for the court's conclusion that she could fairly and impartially hear the case.

In summary, because Judd's responses to voir dire questioning were ambiguous and equivocal, we hold that the trial court erred in denying Brown's motion to dismiss Judd for cause. Because this violation is not harmless, see Justus v. Commonwealth, 220 Va. 971, 975, 266 S.E.2d 87, 90 (1980), we reverse and remand for a new trial.[2]

## LEGALITY OF BROWN'S ARREST AND SUBSEQUENT SEIZURE OF BODY FLUIDS AND HAIR

When a motion to suppress is reviewed on appeal, we must examine the records of both the suppression hearing and the trial to determine whether the evidence was lawfully seized.

---

[2] Because "it is prejudicial error for the trial court to force a defendant to use the peremptory strike afforded him by Code § 19.2-262 to exclude a venireman who is not free from exception," Justus, 220 Va. at 975, 266 S.E.2d at 90, the trial court's failure to dismiss Judd for cause violated Brown's statutory right to a panel of twenty venire members "free from exception." See Code § 8.01-357; see also Griffin v. Commonwealth, 19 Va. App. 619, 621, 454 S.E.2d 363, 365 (1995). Because the right to a panel of twenty jurors free from exception is created by statute, this case is not controlled by the recent decision of the United States Supreme Court in United States v. Martinez-Salazar, 120 S. Ct. 774, 780 (2000) (so long as jury that sits is impartial, fact that defendant had to use peremptory challenge to achieve that result does not represent violation of the Sixth Amendment).

See Spivey v. Commonwealth, 23 Va. App. 715, 721, 479 S.E.2d 543, 546 (1997). The evidence is viewed in the light most favorable to the Commonwealth, granting to it all inferences fairly deducible therefrom and discarding all evidence of the accused that conflicts with that of the Commonwealth. See Burke v. Commonwealth, 30 Va. App. 89, 91, 515 S.E.2d 777, 778 (1999). The burden is on the appellant to demonstrate that, when the evidence is so viewed, the trial court's ruling was plainly wrong or without evidence to support it. See Mu'Min v. Commonwealth, 239 Va. 433, 440, 389 S.E.2d 886, 891, aff'd, 500 U.S. 415 (1991). We review questions of reasonable suspicion and probable cause de novo, as these are mixed questions of fact and law. See McGee v. Commonwealth, 25 Va. App. 193, 197-98, 487 S.E.2d 259, 261 (1997) (en banc). However, the trial court's findings of historical fact are binding unless plainly wrong or without supporting evidence. See id. at 198, 487 S.E.2d at 261.

"[A] police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." Parker v. Commonwealth, 255 Va. 96, 104, 496 S.E.2d 47, 51-52 (1998) (quoting Terry v. Ohio, 392 U.S. 1, 22 (1968)). "In order to justify a Terry seizure, the police officer must be able to point to specific and

- 10 -

articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."  Id. at 104, 496 S.E.2d at 52 (internal quotation omitted).

> "[I]f there are articulable facts supporting a reasonable suspicion that a person has committed a criminal offense, that person may be stopped in order to identify him, to question him briefly, or to detain him briefly while attempting to obtain additional information."  In determining whether a police officer had a particularized and objective basis for suspecting that a person stopped may be involved in criminal activity, a court may consider the totality of circumstances. This test is less stringent than probable cause.

Id. (internal citations omitted).  If a person matches the physical description of a criminal suspect, the police have reasonable suspicion to effect a Terry stop of that individual. See Jones v. Commonwealth, 230 Va. 14, 18, 334 S.E.2d 536, 539 (1985).  In conducting a Terry stop, the police must diligently pursue a means of investigation likely to confirm or dispel their suspicions quickly.  See Thomas v. Commonwealth, 16 Va. App. 851, 857-58, 434 S.E.2d 319, 323 (1993), aff'd en banc, 18 Va. App. 454, 444 S.E.2d 275 (1994); Limonja v. Commonwealth, 8 Va. App. 532, 542, 383 S.E.2d 476, 482 (1989); DePriest v. Commonwealth, 4 Va. App. 577, 587, 359 S.E.2d 540, 545 (1987).

Assuming arguendo that Brown was seized within the meaning of the Fourth Amendment when he was approached by Officers Mora and Fall, and later taken to the police station for questioning,

- 11 -

we find that such a seizure was supported by reasonable suspicion. When the officers first observed Brown talking on a public telephone, they had just thirty minutes earlier been given a physical description of Y.W.'s attacker by the victim herself. Brown matched the attacker's description. The officers encountered Brown no more than three blocks from the scene of the crime, and they observed that his pants and shoes were spattered with mud, suggesting that he had very recently walked through the boggy wooded area behind Lynn Street. Also, when Mora rode his bicycle past Brown and looked toward Brown suddenly without speaking to him, Brown reacted by turning away and "leav[ing] very fast." These facts, viewed in their totality, supported Mora's decision to stop Brown and conduct a limited investigation to determine whether Brown might be the individual Y.W. identified as her attacker.

Mora first ascertained Brown's identity by asking Brown to produce identification, and then, in furtherance of the investigation, sought Brown's consent to go to the police station for additional questioning. Mora informed Brown that he was not under arrest, although he retained Brown's identification card.[3] Brown consented. When Officer Shaw

---

[3] The legality of Brown's seizure does not turn on the retention of his identification card by the police, because the seizure was supported by reasonable suspicion. Cf. Richmond v. Commonwealth, 22 Va. App. 257, 468 S.E.2d 708 (1996) (police officer's retention of defendant's driver's license constituted

- 12 -

arrived, Shaw told Brown again that he was not under arrest, and, although Brown's identification remained in the custody of the police, Shaw again obtained Brown's consent to go to the police station.  En route, Brown also consented to a "show up" at Fred Lynn Middle School, and thereafter he again expressly consented to go to the police station for questioning.  Brown's consent to further questioning was properly obtained, because the seizure was supported by reasonable suspicion.  See Terry, 392 U.S. at 22; Thomas, 16 Va. App. at 857-58, 434 S.E.2d at 323 (because suspect's initial detention was supported by reasonable suspicion, his participation in a show up and in further questioning at the police station were authorized by his consent "to those limited intrusions upon his personal liberties . . ."); see also Greene v. Commonwealth, 17 Va. App. 606, 610, 440 S.E.2d 138, 140-41 (1994) ("Acquiescence in a police request, which most citizens will do, does not negate the consensual nature of the response.").

Within fifteen minutes of the commencement of the questioning at the police station, Detective Hayhurst obtained sufficient information to establish probable cause to arrest Brown for the crimes charged.  Brown was consequently arrested and charged with the crimes at issue in this appeal; the

unlawful seizure of defendant's person, because officer lacked reasonable suspicion to detain defendant).

- 13 -

subsequent search and seizure of his body fluids and hair were permissible adjuncts of a search incident to arrest.  See Commonwealth v. Gilmore, 27 Va. App. 320, 327, 498 S.E.2d 464, 468 (1997) ("One of the established exceptions to the Fourth Amendment's warrant requirement is for a search incident to a lawful arrest." (citing United States v. Robinson, 414 U.S. 218, 224 (1973))).  The trial court, therefore, did not err in denying Brown's motion to suppress this evidence.

SEARCH OF BROWN'S HOME

Brown contends that a security search of his home made by the police prior to the issuance of a search warrant was unlawful and that the court erred by refusing to suppress evidence deriving from that search.  We assume without deciding that the search was unlawful, but hold the evidence recovered from the house was admissible because it did not result from the security search.

Officers Kohl and Muller went to Brown's home at 8:15 p.m. on July 7, 1998.  Brown's wife, Dewanna Brown, answered the door, and the officers asked if they could come in.  After entering the house, the officers advised Mrs. Brown that the house was a potential crime scene and that a detective was then obtaining a search warrant.  They told her she would have to leave the house and could not go upstairs unaccompanied while she remained in the house.  They waited with her for

- 14 -

approximately one hour until a friend came to get her.  While they waited, the officers conducted a security sweep of the house to check for the presence of other persons or evidence that might be easily destroyed.  No evidence was found or seized during this protective sweep.  The search warrant was obtained at 11:32 p.m.  The warrant was executed at 2:00 a.m. on July 8, 1998, and the police seized three metal buttons, a Bic pen, a lid to the pen, and a bedspread.

"[E]vidence will not be excluded as 'fruit' [of the poisonous tree] unless the illegality is at least the 'but for' cause of the discovery of the evidence.  Suppression is not justified unless 'the challenged evidence is in some sense the product of illegal government activity.'"  Segura v. United States, 468 U.S. 796, 815 (1984).  Evidence is not tainted as "fruit of the poisonous tree" if there is no "poisonous tree." Here, the evidence challenged by Brown was discovered upon the execution of a duly issued search warrant, not as the result of the "protective sweep" conducted by the police before the warrant was issued.

### SUFFICIENCY OF THE EVIDENCE TO PROVE ATTEMPT TO ABDUCT WITH INTENT TO DEFILE

Brown contends the evidence at trial was insufficient to prove he attempted to abduct J.M. with the intent to defile.  He bases his contention on the fact that "[t]he sole evidence

introduced on this charge was that the defendant had grabbed the victim and attempted to pull her into his residence."

> Because we find grounds to reverse the case on the basis of [the court's failure to dismiss a juror for cause] and remand the case for a new trial, we address [the defendant's] claim that the Commonwealth failed to present sufficient evidence of his attempt to [abduct with intent to defile]. If the evidence adduced at trial was insufficient to convict [the defendant], he is entitled to an acquittal [on that charge]; if he is so entitled, a remand for retrial would violate the Constitution's prohibition against double jeopardy.

Parsons v. Commonwealth, 32 Va. App. 576, 581, 529 S.E.2d 810, 812 (2000). "[A] full sufficiency analysis is required to satisfy the mandate of the Double Jeopardy Clause of the federal Constitution." Id. (citing Burks v. United States, 437 U.S. 1 (1978)); see Timbers v. Commonwealth, 28 Va. App. 187, 202, 503 S.E.2d 233, 240 (1998).

When sufficiency of the evidence is challenged on appeal, the judgment of the trial court is presumed correct. See Johnson v. Commonwealth, 12 Va. App. 391, 396, 404 S.E.2d 384, 387 (1991). We consider the evidence in the light most favorable to the Commonwealth, discarding all evidence offered by the accused that conflicts with that of the Commonwealth, and grant to the Commonwealth all inferences reasonably deducible from the evidence. See Norman v. Commonwealth, 2 Va. App. 518, 520, 346 S.E.2d 44, 45 (1986). "A trial court's judgment

- 16 -

approving a jury verdict is entitled to great weight on appeal and will not be disturbed unless it is contrary to the law or plainly wrong."  Gray v. Commonwealth, 233 Va. 313, 344, 356 S.E.2d 157, 174, cert. denied, 484 U.S. 873 (1987).

To prove attempt, the Commonwealth must show 1) an intent to commit the crime, and 2) some direct, but ineffectual, act toward its commission sufficient to amount to the commencement of the consummation of the crime.  See Haywood v. Commonwealth, 20 Va. App. 562, 565, 458 S.E.2d 606, 607-08 (1995).  "'Intent is the purpose formed in a person's mind which may, and often must, be inferred from the facts and circumstances in a particular case.'  The state of mind of an accused may be shown by his conduct . . . ."  Hughes v. Commonwealth, 18 Va. App. 510, 519, 446 S.E.2d 451, 457 (1994) (en banc) (citations omitted).

In this case, Brown's intent to abduct and "defile" J.M. may fairly be inferred from the evidence that he had just abducted, raped, and sodomized Y.W. at the time he told Y.W. to call J.M. to the door of his house.  When J.M. approached the door, where Brown held a knife to Y.W.'s back, Brown attempted to seize J.M. by the strap of her bib shorts and pull her inside.  Such circumstantial evidence suffices to show intent.  Brown's act of grabbing J.M.'s shoulder strap also constituted a direct, ineffectual act toward the completion of the crime of

abduction, an act that failed only because the strap broke and J.M. was able to flee.  Thus, the jury had sufficient evidence to conclude that Brown attempted to abduct J.M. with the intent to defile, and the jury's conclusion was not plainly wrong.  A new trial will not violate the Constitution's Double Jeopardy Clause.  See Parsons, 32 Va. App. at 581, 529 S.E.2d at 812.

DENIAL OF BROWN'S JURY INSTRUCTIONS "D" AND "E"

Although we must consider a challenge to sufficiency of the evidence when we reverse on other grounds, we need not examine the propriety of proposed jury instructions in such a circumstance.  "In a case where a new trial is awarded [on other grounds] . . . [if] after a mature consideration of the questions dealing with the various [jury] instructions, we have an abiding conviction that no error was committed, a seriatim discussion is wholly unnecessary."  Abdell v. Commonwealth, 173 Va. 458, 476, 2 S.E.2d 293, 300 (1939).  We find no evidence to support an instruction to the jury on either attempted rape or attempted forcible sodomy, and hold the trial court's refusal to give Brown's proposed jury instructions was appropriate.

For the reasons stated in this opinion, we reverse the convictions and remand for a new trial if the Commonwealth be so advised.

Reversed and remanded.

- 18 -