# COURT OF APPEALS OF VIRGINIA

Present: Judges Chaney, Callins and Senior Judge Petty
Argued by videoconference

ARUN RASHID TURAY

v.      Record No. 0868-21-3

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
JUDGE VERNIDA R. CHANEY
MARCH 21, 2023

UPON A REHEARING

FROM THE CIRCUIT COURT OF THE CITY OF WAYNESBORO
Paul A. Dryer, Judge

Jessica N. Sherman-Stoltz (Sherman-Stoltz Law Group, PLLC, on
briefs), for appellant.

Liam A. Curry, Assistant Attorney General (Jason S. Miyares,
Attorney General, on briefs), for appellee.

Arun Rashid Turay (Turay) entered conditional guilty pleas in the Circuit Court for the City

of Waynesboro (circuit court) and appealed the circuit court's denial of his motion to suppress

evidence.[1] Turay contends on appeal that the circuit court erred in finding that the police had

reasonable, articulable suspicion to detain him and, therefore, erred in denying his motion to

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413.

[1] Pursuant to Code § 19.2-254, Turay's entry of conditional guilty pleas reserved his right to
appellate review of the circuit court's adverse determination of his suppression motion. Based on
his conditional guilty pleas, Turay was convicted of armed burglary in violation of Code § 18.2-90,
robbery in violation of Code § 18.2-58, use of a firearm in commission of robbery in violation of
Code § 18.2-53.1, and possession or transportation of a firearm after having been convicted of a
violent felony in violation of Code § 18.2-308.2.

suppress the fruits of his unconstitutional seizure.[2]  A divided panel of this Court issued a decision on October 18, 2022, affirming the circuit court's judgment denying Turay's suppression motion. Turay timely petitioned the panel to reconsider its decision.  The panel granted Turay's petition for rehearing, withdrew the panel's original opinion, and vacated the mandate by order dated November 22, 2022.  After rehearing, this Court agrees with Turay and reverses the circuit court's judgment denying his motion to suppress.

BACKGROUND

"In accordance with familiar principles of appellate review, the facts will be stated in the light most favorable to the Commonwealth, the prevailing party" in the circuit court.  *McGowan v. Commonwealth*, 72 Va. App. 513, 516 (2020) (quoting *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018)).  This Court "regard[s] as true all credible evidence favorable to the Commonwealth and all inferences that may reasonably be drawn from that evidence."  *Id.* (citing *Gerald*, 295 Va. at 473).

On February 17, 2020, late in the evening, Deputy Sheriff Stroop of Augusta County responded to a radio call regarding a robbery in Waynesboro.  When Deputy Stroop drove by the crime scene in Waynesboro, an officer on the roadway told him "there [were] people inside the house that weren't supposed to be there, a firearm was taken, and then they fled on foot."  Although unfamiliar with the area, Deputy Stroop decided to drive around to look for the suspects.

While Deputy Stroop was driving, he heard Sergeant Lemons announce on the radio a "be on the lookout" (BOLO) for "three Black males, all armed" and "wearing black sweatshirts." Around 11:30 p.m., about thirty minutes after the robbery, Deputy Stroop stopped and detained two

---

[2] Turay's co-defendant, Justice Ahmad Carr, filed a separate appeal to this Court challenging the denial of his motion to suppress, which was heard in the circuit court in a joint evidentiary hearing with Turay's suppression motion.  *See Carr v. Commonwealth*, No. 1136-21-3 (Va. Ct. App. Oct. 18, 2022) (vacating convictions where defendant was unlawfully seized without reasonable, articulable suspicion of criminal activity and the trial court erred in failing to suppress evidence obtained pursuant to the unconstitutional seizure).

Black men who "were walking down the road." The two men seized by the deputy were Turay and his co-defendant, Justice Ahmad Carr (Carr). The location of the seizure was approximately six to ten blocks from the scene of the robbery, although Deputy Stroop testified that he did not recall how far he was from the crime scene when he stopped Turay and Carr. Deputy Stroop testified that at the time of the seizure, there were not many people out on the street where Turay and Carr were walking. Deputy Stroop also testified that Turay and Carr were not doing anything but walking down the road in a residential neighborhood.

Deputy Stroop testified that he seized Turay and Carr after he concluded "[t]hey matched the description of what was given out" over the radio. According to Sergeant Lemons's police report and testimony, neither Turay's nor Carr's clothing matched the suspects' clothing description that Sergeant Lemons gave in the BOLO.[3] Sergeant Lemons testified that Turay was wearing a black hooded jacket with a red stripe down the arm. Officer Mawyer, a patrol officer who responded to the BOLO, also testified that Turay "was wearing a black jacket with a distinct red stripe . . . down the sleeves" and Carr was wearing gray pants and a white hoodie. The police

---

[3] Sergeant Lemons's testimony:

> Q: And then you arrived, and you immediately saw that they weren't wearing what was described, or what you knew personally from the — from the cell phone footage; right?
>
> A: Correct. . . . *[T]he clothing didn't match; that's correct.*
>
>    . . . .
>
> Q: Do you recall, in your report, that . . . You indicated in your report that at the time of arrival that the first thing you noticed was that neither of the males' clothing description matched what you had said over the radio?
>
> A: I do recall that; yes, ma'am.

(Emphasis added).

- 3 -

bodycam video shows Carr wearing light gray pants, a long-sleeved white top with a multi-colored print and lettering on the front, a white or light-colored cap with a dark brim, turned backward, and a backpack with a floral design. The police bodycam video shows Turay wearing black pants and a long-sleeved black top with a wide red stripe down each sleeve and a wider blue stripe on each side of the garment.

Deputy Stroop held Turay and Carr at gunpoint and directed them to place their hands on the hood of his police car. Moments later, after Deputy Stroop notified Waynesboro police, Officers Cacciapaglia and Mawyer from Waynesboro arrived separately at Deputy Stroop's location to determine whether he had detained the right people.

Upon Officer Mawyer's arrival at the detention site, Sergeant Lemons provided a more detailed description of the suspects' clothing, including information obtained after the BOLO. After hearing this additional information, the Waynesboro patrol officers handcuffed and searched Turay and Carr. Neither Turay nor Carr possessed any weapons. But Carr possessed credit cards belonging to one of the victims, and Turay had a bookbag that contained a victim's keys in addition to bloody clothes and shoes that looked the same as items seen on the video of the robbery. A DNA comparison showed that the blood on the clothes matched one of the victims.

Turay filed a suppression motion in the circuit court alleging that his detention by Deputy Stroop was an unconstitutional seizure because it was not supported by reasonable, articulable suspicion that Turay was involved in the robbery. Carr also filed a suppression motion alleging that he was unconstitutionally stopped and detained without reasonable, articulable suspicion. After a joint hearing on both defendants' suppression motions, the circuit court denied both motions for the reasons stated in its letter opinion dated March 24, 2021 (March 2021 letter opinion).

In the March 2021 letter opinion, the circuit court made the following factual findings:

- The first BOLO description radioed by Sergeant Lemons described the suspects as "three Black males wearing black."

- Although Sergeant Lemons radioed more detailed descriptions of the suspects' clothing after the initial BOLO, "Deputy Stroop would have only heard the first description prior to detaining the Defendants."

- When Sergeant Lemons arrived at the location where Turay and Carr were detained, "he noticed that their clothing did not match precisely the descriptions that he previously gave over his police radio."

- "Carr's clothing was not black," but "Turay's clothing was black, matching the description heard by Deputy Stroop."

- "Neither [Carr nor Turay] was wearing black sweatpants with a red stripe."

- "[T]he Defendants at the time [Deputy] Stroop encountered them, matched the description in sex, race, and some of the clothing."

- "[T]here were no other people out in the neighborhood during this time" when Deputy Stroop observed Turay and Carr walking down the street late in the evening.

- "[T]he Defendants were the only two people Deputy Stroop encountered walking in the residential neighborhood, at 11:30 p.m., a relative short distance from the crime scene within thirty minutes of the crime."

The circuit court also found that, taken together, the factors of proximity, time, physical description, gender, and racial description "gave Deputy Stroop, an objective, reasonable suspicion that the Defendants may have been involved in the crime that occurred a few blocks away and a few minutes before his encounter with them." Thus, the circuit court found that Deputy Stroop had reasonable, articulable suspicion to stop and detain Turay and Carr. Based on these findings, the circuit court held that "the stop and detention of the Defendants by Deputy Stroop was not in violation of the Fourth Amendment." Accordingly, the circuit court denied both defendants' suppression motions. This appeal followed.

ANALYSIS

A. Standard of Review

On appeal of the denial of a motion to suppress evidence, this Court "determine[s] whether the accused has met his burden to show that the trial court's ruling, when the evidence is viewed in the light most favorable to the Commonwealth, was reversible error." *Merid v.*

*Commonwealth*, 72 Va. App. 104, 108 (2020) (quoting *Cantrell v. Commonwealth*, 65 Va. App. 53, 56 (2015)), *aff'd*, 300 Va. 77 (2021), *cert. denied sub nom. Merid v. Virginia*, 142 S. Ct. 1137 (2022). Turay's "claim that [he] was seized in violation of the Fourth Amendment presents a mixed question of law and fact . . . ." *Id.* at 108-09 (quoting *King v. Commonwealth*, 49 Va. App. 717, 721 (2007)). This Court is "bound by the trial court's findings of historical fact unless 'plainly wrong' or without evidence to support them and we give due weight to the inferences drawn from those facts by resident judges and local law enforcement officers." *Id.* at 109 (quoting *Cantrell*, 65 Va. App. at 56). "However, we consider *de novo* whether those facts implicate the Fourth Amendment and, if so, whether the officers unlawfully infringed upon an area protected by the Fourth Amendment." *Id.* (quoting *Cantrell*, 65 Va. App. at 56); *see also Moreno v. Commonwealth*, 73 Va. App. 267, 274 (2021) ("[We] review[ ] *de novo* the overarching question of whether a search or seizure violated the Fourth Amendment." (quoting *Williams v. Commonwealth*, 71 Va. App. 462, 475 (2020))).

### B. Motion to Suppress the Fruits of the Unconstitutional Seizure

Turay argues on appeal that the circuit court erred in denying his motion to suppress because Deputy Stroop unreasonably seized him without a warrant and without reasonable, articulable suspicion that he was engaged in criminal activity. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "If a police officer has reasonable, articulable suspicion that a person is engaging in, or is about to engage in, criminal activity, the officer may detain the suspect to conduct a brief investigation without violating the person's Fourth Amendment protection against unreasonable searches and seizures." *Long v. Commonwealth*, 72 Va. App. 700, 712 (2021) (quoting *McGee v. Commonwealth*, 25 Va. App. 193, 202 (1997) (en banc)). "A reasonable, articulable suspicion is 'a particularized and objective basis for suspecting the person

stopped of criminal activity.'" *Id.* (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). To determine whether a police seizure is reasonable under the Fourth Amendment, this Court considers the totality of the particular circumstances at the time of the seizure. *See Harmon v. Commonwealth*, 15 Va. App. 440, 445 (1992).

We hold that Deputy Stroop's detention of Turay violated his Fourth Amendment right against unreasonable seizures because, at the time of the seizure, there was no particularized, objective basis for suspecting Turay of criminal activity. There is no evidence that Deputy Stroop observed Turay or Carr do anything suspicious or evasive. Deputy Stroop detained Turay and Carr when they were merely walking—not rushing—down the street at night in a residential neighborhood. There is no evidence that they were walking away from, rather than toward, the scene of the robbery. The mere observation of two Black men walking late at night in a residential neighborhood cannot give rise to reasonable, individualized suspicion that they were involved in a robbery that occurred six to ten blocks away thirty minutes earlier. *See McCain v. Commonwealth*, 275 Va. 546, 552 (2008) ("The character of the location and the time at which a person is observed are relevant factors, but they do not supply a particularized and objective basis for suspecting criminal activity on the part of the particular person stopped." (citing *Brown v. Texas*, 443 U.S. 47, 51-52 (1979); *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000))). And the circuit court's finding that "there were no other people out in the neighborhood" when Turay and Carr were walking down the street is not a reasonable inference from the only evidence on that issue—that there were not a lot of people out on the street at that time. Although this Court defers to the circuit court's factual findings, we reject unreasonable inferences that are not supported by the evidence. *See Potts v. Commonwealth*, 12 Va. App. 1093, 1099 (1991).

Deputy Stroop testified that he detained Turay and Carr only because he thought they matched the description of the suspects in the BOLO. Yet the BOLO only included a vague

description of clothing and did not include a description of any suspect's height, weight, build, hair style, facial characteristics, age, or any other distinguishing physical features apart from the general classifications of race (Black) and gender (male).

In fact, the record shows that Turay and Carr did not match the extremely vague BOLO description of three armed Black males wearing black sweatshirts. First, as Sergeant Lemons testified and recorded in his police report, the first thing he noticed when he saw Turay and Carr was that neither Turay's nor Carr's clothing matched the suspects' clothing description in the BOLO.[4] Carr was not wearing black at all, but was wearing a white top and light gray pants. Turay was wearing a black jacket or black sweatshirt with distinctive red stripes down the sleeves and a wider blue stripe on each side. Second, there were only two men, not three. Third, nothing in the record supports an inference that either Turay or Carr appeared to be armed; in fact, neither was armed.

Considering the facts available to Deputy Stroop at the time of the seizure, as we must, Deputy Stroop's observations of Turay did not provide a particularized, objective basis for suspecting Turay's involvement in the robbery or any other criminal activity. *See Terry v. Ohio*,

---

[4] According to the dissent, even if Turay and Carr's clothing did not match the BOLO description of the suspects' clothing, Deputy Stroop reasonably stopped them based on his honest belief that their clothing matched the BOLO description. The dissent concludes that the deputy's honest mistake of fact does not warrant the suppression of evidence. However, as the Supreme Court recognized in *Terry*, "[i]f subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be 'secure in their persons, houses, papers, and effects,' only in the discretion of the police." *Terry v. Ohio*, 392 U.S. 1, 22 (1968) (quoting *Beck v. Ohio*, 379 U.S. 89, 97 (1964)).

Although the suppression of evidence is not warranted when the justification for a seizure includes an officer's *reasonable* mistake of fact, the record does not support a finding that Deputy Stroop reasonably mistook Turay and his companion, Carr—who was wearing a long-sleeved white top—for two Black males wearing black sweatshirts. *Cf. Heien v. North Carolina*, 574 U.S. 54, 57 (2014) (Under the Fourth Amendment, "a search or seizure may be permissible even though the justification for the action includes a reasonable factual mistake."); *Collins v. Commonwealth*, 297 Va. 207, 218 (2019) (holding that suppression is not a proper remedy for a Fourth Amendment violation where the police acted with an objectively reasonable, good faith belief that the search and seizure were constitutional).

392 U.S. 1, 21-22 (1968) (establishing that the court should consider "the facts available to the officer at the moment of the seizure"). Deputy Stroop expressly testified that he stopped Turay and Carr because he thought they matched the BOLO description. But even if Turay had been wearing a garment that could be accurately described as a "black sweatshirt," as described in the BOLO, wearing such a non-distinctive garment—without more—does not support a finding of particularized reasonable suspicion of criminal activity. "In the absence of other circumstances that provide sufficient particularity, a generalized description applicable to large numbers of people contradicts the Fourth Amendment's jurisprudence demanding specificity and will not suffice to justify the seizure of any individual." *Armstrong v. United States*, 164 A.3d 102, 108 (D.C. 2017) (citations omitted) (holding that the lookout description was insufficiently particularized where the description consisted of "a white car, possibly a Mercury Sable, with tinted windows and two Black males"); s*ee also United States v. Brown*, 448 F.3d 239, 247 (3d Cir. 2006) (holding that the police radio broadcast of a description of two Black male robbery suspects "fail[ed] to satisfy the Fourth Amendment's 'demand for specificity'" (quoting *Terry*, 392 U.S. at 21 n.18)). Here, the BOLO description of three Black males wearing black sweatshirts lacks the particularized specificity necessary to warrant the seizure of any person. *See Terry*, 392 U.S. at 21 n.18 ("This demand for specificity in the information upon which police action is predicated is the central teaching of [the United States Supreme] Court's Fourth Amendment jurisprudence.").

Because there was no particularized, objective basis for suspecting that Turay was engaged in criminal activity, Deputy Stroop's seizure of Turay was without reasonable, articulable suspicion that Turay was involved in the robbery. Therefore, because Turay was seized in violation of his Fourth Amendment right against unreasonable seizures, we conclude that the circuit court erred in denying Turay's motion to suppress the fruits of the officers' Fourth Amendment violation. S*ee*

*Terry*, 392 U.S. at 15 (holding that an unreasonable search or seizure by police "must be condemned by the judiciary and its fruits must be excluded from evidence in criminal trials"); *see also Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963).

## CONCLUSION

The warrantless seizure of Turay violated the Fourth Amendment because, at the time of the seizure, the police lacked particularized reasonable, articulable suspicion that Turay was engaged in criminal activity. Therefore, this Court holds that the circuit court erred in denying Turay's motion to suppress the fruits of the unconstitutional seizure. Accordingly, this Court reverses the circuit court's decision denying the motion to suppress, vacates Turay's convictions, and remands to the circuit court for further proceedings not inconsistent with this opinion, allowing Turay to withdraw his guilty pleas pursuant to Code § 19.2-254.

*Reversed and remanded.*

Petty, S.J., dissenting.

Last October we issued an opinion affirming the trial court's denial of Turay's motion to suppress. *Turay v. Commonwealth*, No. 0868-21-3 (Va. Ct. App. Oct. 18, 2022) (*Turay I*). Despite there being no change to either the facts or the law since that opinion, a majority of the panel granted Turay's petition for rehearing and has now reversed course. I continue to believe that the panel was correct in its initial decision, and I have seen nothing that would change the outcome. Therefore, for the reasons set out in the majority opinion in *Turay I* as well as those reasons I expressed in my dissent to the companion case of *Carr v. Commonwealth*, No. 1136-21-3 (Va. Ct. App. Oct. 18, 2022), I respectfully dissent.

## VIRGINIA:

*In the Court of Appeals of Virginia on* **Tuesday** *the* **22nd** *day of* **November, 2022**.

Arun Rashid Turay,                                                                                                    Appellant,

  against            Record No. 0868-21-3
                        Circuit Court Nos. CR20000396-00 through CR20000398-00 and
                        CR20000400-00

Commonwealth of Virginia,                                                                                   Appellee.

Upon a Petition for Rehearing

Before Judges Chaney, Callins and Senior Judge Petty

On November 1, 2022 came the appellant, by counsel, and filed a petition praying that the Court set aside the judgment rendered herein on October 18, 2022, and grant a rehearing thereof.

On consideration whereof, the petition for rehearing is granted, the opinion rendered on October 25, 2022 is withdrawn, the mandate entered on that date is vacated, and this appeal will be reconsidered by the panel of judges that originally considered the matter.

Pursuant to Rule 5A:35(a), the respondent may file an answering brief within 21 days of the date of entry of this order. An electronic version of the brief shall be filed with the Court and served on opposing counsel.[1]

A Copy,

Teste:

A. John Vollino, Clerk

*original order signed by a deputy clerk of the*
By:    *Court of Appeals of Virginia at the direction*
        *of the Court*

Deputy Clerk

---

[1] The guidelines for filing electronic briefs can be found at www.courts.state.va.us/online/vaces/resources/guidelines.pdf.

Present:   Judges Chaney, Callins and Senior Judge Petty
Argued at Lexington, Virginia


ARUN RASHID TURAY

v.        Record No. 0868-21-3

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
JUDGE WILLIAM G. PETTY
OCTOBER 18, 2022

FROM THE CIRCUIT COURT OF THE CITY OF WAYNESBORO
Paul A. Dryer, Judge

Jessica N. Sherman-Stoltz (Sherman-Stoltz Law Group, PLLC, on
briefs), for appellant.

Liam A. Curry, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Following conditional guilty pleas, Arun Rashid Turay appeals his convictions for armed

burglary with the intent to commit robbery, robbery, use of a firearm in commission of a felony, and

felon in possession of a firearm in violation of Code §§ 18.2-90, 18.2-58, 18.2-53.1, and 18.2-308.2.

Turay asserts that the trial court erred when it denied his motion to suppress evidence obtained

pursuant to a *Terry*[1] stop.  For the following reasons, we disagree and affirm the judgment of the

trial court.

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] *Terry v. Ohio*, 392 U.S. 1 (1968).

BACKGROUND[2]

Turay and his co-defendant Justice Ahmed Carr filed a joint motion to suppress evidence.[3] At a joint hearing on those motions, Waynesboro Police Sergeant Lemons testified that at 11:30 p.m. on February 17, 2020 he was dispatched to a home in response to a potential burglary. The homeowner had called the police when his home security video system alerted him to three intruders in his home. When Lemons arrived, he spoke with the homeowner and two residents. The homeowner reported that he was missing a firearm. The two residents who sustained injuries informed Lemons that they had been "pistol-whipped" by one of the three intruders.[4] They described their assailants as "three Black males who were all armed, and that they were wearing black." Lemons transmitted over the radio that responding officers should be on the lookout (BOLO) for "three black males wearing black."

Augusta County Sheriff's Deputy Stroop was patrolling near Waynesboro when he heard the dispatch. He stopped by the crime scene and spoke with one of the Waynesboro officers outside who informed him that there had been "people inside the house that weren't supposed to be there, a firearm was taken, and then they fled on foot." Stroop continued his patrol of the area, and he heard the BOLO description over the radio. He soon encountered two men, later identified as Turay and

---

[2] "In reviewing the denial of a motion to suppress, we consider the facts in the light most favorable to the Commonwealth, the prevailing party" below. *Hairston v. Commonwealth*, 67 Va. App. 552, 560 (2017) (internal quotation marks omitted) (quoting *Malbrough v. Commonwealth*, 275 Va. 163, 168 (2008)).

[3] In a separate appeal decided this day, Turay's co-defendant raised the same issue. *Carr v. Commonwealth*, No. 1136-21-3 (Va. Ct. App. Oct. 18, 2022). Because these cases were heard and decided together in the trial court, we will refer to evidence relating to both appellants in this opinion.

[4] The firearm was later recovered in the bedroom, where a resident had taken it while waiting for officers to arrive.

Carr, walking down the road in a nearby residential neighborhood. Stroop noted that it was dark, late in the evening, and cold and that there were not a lot of other people on the street.

Meanwhile, Lemons viewed the homeowner's security video footage. While watching the video, Lemons dispatched a second, more detailed BOLO. The second BOLO described the suspects as "Black males, with black hoodies, with the black pants with the red stripes—and the third individual, who had . . . a black and white striped hoodie, . . . [and] it looked like a leopard-print pajama-type bottom." In the time between Lemons' first BOLO and his watching the video of the incident, dispatch notified him that an Augusta County sheriff's deputy, later learned to be Stroop, had detained two suspects.

At the hearing, Stroop could not recall the details of the description he had heard, but he testified that he did remember that the men "matched the description of what was given out" and that he "remember[ed] saying to [him]self, 'Hey; that matches the description that I heard over the radio.'"[5] Stroop did not recall how many descriptions he may have heard or whether any updates had been provided.

Stroop decided to stop the men until the investigating Waynesboro officers could arrive. Because a firearm reportedly was involved and he was alone, Stroop initially detained the pair at gunpoint for his safety.[6] Complying with Stroop's instructions, Turay and Carr put their hands on the hood of his car, and Stroop informed dispatch that he had detained two suspects who matched

---

[5] Stroop testified that prior to the hearing he had reviewed the dispatcher's notes of the description that was put out by Lemons and that the suspects he detained matched that description.

[6] We note that, "[d]uring *Terry* stops, the police are permitted to use methods of restraint that are reasonable under the circumstances." *Harris v. Commonwealth*, 27 Va. App. 554, 563 (1998). On appeal, Turay does not contend that the amount of restraint used by Stroop was unreasonable or that it converted the encounter from a *Terry* stop to a full, custodial arrest requiring probable cause. He only argues that the initial stop was not supported by reasonable suspicion.

the description in the BOLO. Turay and Carr were detained about thirty minutes after the robbery, and Waynesboro police arrived within two minutes of their detention.

Turay and Carr were standing in front of the hood of Stroop's car when Officer Mawyer arrived at the detention site, which he testified was six to ten blocks from the crime scene. Mawyer radioed Lemons to repeat the description of the suspects; after hearing Lemons' response, Mawyer, with the help of other officers at the scene, placed Turay and Carr in handcuffs. Footage recorded by Mawyer's body camera was admitted into evidence; it depicted Mawyer's journey from the crime scene to the detention site.

When Lemons arrived, he noticed that Carr was wearing a white t-shirt, grey sweatpants, glasses, and possessed a floral backpack. Turay was wearing black jeans and a black, red-striped jacket that was similar to the black, red-striped pants he observed one of the suspects wearing in the video. Lemons noted that Turay's jacket was made of a "jogging material," so it looked to be part of a matching set with the pants he had seen one of the suspects wearing on the video.

Waynesboro Officer Cacciapaglia obtained Carr's consent to search his person and found the victims' credit cards in his pockets. Lemons then arrested Turay and Carr. The police searched Turay's backpack incident to his arrest and found bloody clothes and shoes matching those Lemons had seen on the home surveillance video; some keys and other items the victims were missing were also recovered. Turay moved to suppress the evidence.

The trial court took the matter under advisement and issued its ruling in a March 24, 2021 letter opinion. The trial court specifically addressed "whether Augusta County Deputy Stroop had the requisite reasonable, articulable suspicion to stop and detain [Turay and Carr]." In considering the issue, the trial court made certain factual findings. It found that Mawyer already was en route to the detention site when "the second description of the suspects is relayed over the radio" so that Stroop heard only the first description—"three black males wearing black"—before detaining Turay

- 4 -

and Carr shortly before 11:35 p.m. Turay and Carr, both Black males, were walking down the street in a residential neighborhood late on a cold evening. Based on Mawyer's body camera video, the trial court concluded that the men had been detained "a distance less than 10 blocks and likely less than six blocks," and less than a minute's drive, from the crime scene and that no other people were around. Turay was wearing a black, red-striped sweatshirt[7] and black pants.

The trial court correctly observed that whether the evidence would be suppressed "hinge[d] on whether or not Deputy Stroop had the requisite reasonable, articulable suspicion to stop and detain the [d]efendants given the totality of the circumstances on the night in question." Stressing "[t]he confluence of multiple factors of proximity, time, physical description, gender, and racial description[,]" the trial court denied Turay's and Carr's motion to suppress, finding that "[g]iven the totality of these facts, it would have been a dereliction of Deputy Stroop's duties as a law enforcement officer to have ignored the [d]efendants walking down the street without making an investigatory stop." The trial court rejected Turay's and Carr's arguments focused on the discrepancies in the number of men and the specific clothing descriptions, instead finding that the "facts gave Deputy Stroop[] an objective, reasonable suspicion that the [d]efendants may have been involved in the crime that occurred a few blocks away and a few minutes before his encounter with them."

Upon denial of his motion to suppress, Turay entered conditional guilty pleas to armed burglary with the intent to commit robbery, robbery, use of a firearm in commission of a felony, and

---

[7] The trial court's memorandum opinion characterizes the garment Turay was wearing as a sweatshirt, but the officers characterize the garment as a jacket. For purposes of this opinion, we will refer to it as a jacket.

- 5 -

being a felon in possession of a firearm.[8]  The trial court accepted the pleas and convicted Turay of the charges.

On appeal, Turay contends that the trial court erred in denying his motion to suppress because his "Fourth and Fourteenth Amendment Rights were violated when law enforcement, having no reasonable articulable suspicion of criminal activity, stopped and seized him."  He argues that the investigatory stop was premised on nothing more than Stroop's hunch and was unjustified because the description of the suspects was too vague and not particularized as to him.

## ANALYSIS

### I. Standard of Review

Turay's claim that he was seized in violation of the Fourth Amendment presents a mixed question of law and fact that we review *de novo* on appeal.  *Murphy v. Commonwealth*, 264 Va. 568, 573 (2002).  In conducting our review, however, "we defer to the trial court's findings of 'historical fact'" unless such findings are "plainly wrong or devoid of supporting evidence." *Barkley v. Commonwealth*, 39 Va. App. 682, 690 (2003) (first quoting *Davis v. Commonwealth*, 37 Va. App. 421, 429 (2002); then citing *Mier v. Commonwealth*, 12 Va. App. 827, 828 (1991)).  In doing so, we are required to "give due weight to the inferences drawn from those facts by resident judges and local law enforcement officers."  *McGee v. Commonwealth*, 25 Va. App. 193, 198

---

[8] Code § 19.2-254 permits a defendant to enter a conditional guilty plea in certain circumstances.  In pertinent part, it provides that

> [w]ith the approval of the court and the consent of the
> Commonwealth, a defendant may enter a conditional plea of guilty
> in a misdemeanor or felony case in circuit court, reserving the
> right, on appeal from the judgment, to a review of the adverse
> determination of any specified pretrial motion.  If the defendant
> prevails on appeal, he shall be allowed to withdraw his plea.

The terms of Turay's plea allowed him to appeal the trial court's denial of his pretrial motion to suppress.

(1997) (*en banc*).  On appeal, Turay has the burden to show that, considering the evidence in the light most favorable to the Commonwealth, the trial court's denial of his suppression motion was reversible error.  *Murphy*, 264 Va. at 573.

## II.  The Fourth Amendment and police-citizen encounters

In pertinent part, the Fourth Amendment provides "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated[.]"  The Amendment's protection against unreasonable seizures potentially is implicated whenever a police officer performing his or her duties encounters a citizen.

Courts have recognized three basic categories of police-citizen encounters.

> First, there are communications between police officers and citizens that are consensual and, therefore, do not implicate the fourth amendment.  Second, there are brief investigatory stops which must be based on specific and articulable facts which, taken together with rational inferences from these facts, reasonably warrant a limited intrusion.  Third, there are highly intrusive, full-scale arrests, which must be based on probable cause.

*Iglesias v. Commonwealth*, 7 Va. App. 93, 99 (1988).  Here, there is no dispute that, from its inception, the encounter between Turay, Carr, and Stroop was non-consensual.  Similarly, given that Turay only asserts that Stroop lacked reasonable, articulable suspicion to initiate the stop, it is undisputed that, at the relevant time, Stroop's seizure of Turay did not amount to a full, custodial arrest requiring probable cause.  Accordingly, the question before us is whether the trial court erred in concluding that Stroop possessed sufficient reasonable, articulable suspicion to justify a "brief investigatory stop[.]"  *Id.*

III. The reasonable, articulable suspicion standard[9]

As noted above, police, consistent with the Fourth Amendment, may "conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Bass v. Commonwealth*, 259 Va. 470, 474-75 (2000) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).

> Reasonable suspicion is simply suspicion that is reasonable. It is not something more than suspicion. And it can hardly be called proof. To be sure, the degree of certitude required by reasonable suspicion is "'considerably less than proof of wrongdoing by a preponderance of the evidence,' and 'obviously less demanding than that for probable cause.'"

*Mason v. Commonwealth*, 64 Va. App. 292, 300 (2015) (quoting *Perry v. Commonwealth*, 280 Va. 572, 581 (2010)), *aff'd*, 291 Va. 362 (2016), *see also Navarette v. California*, 572 U.S. 393 (2014). Consequently, "the mere possibility of an innocent explanation does not necessarily exclude a reasonable suspicion that the suspect might be violating the law." *Morris v. City of Va. Beach*, 58 Va. App. 173, 183 (2011) (internal quotation marks omitted).

To have reasonable suspicion, a police officer need only have a "'minimal level of objective justification' for making . . . a stop." *Branham v. Commonwealth*, 283 Va. 273, 280 (2012) (quoting *I.N.S. v. Delgado*, 466 U.S. 210, 217 (1984)). Although the reasonable suspicion must be "particularized" to the person or persons stopped, *Whitfield v. Commonwealth*, 265 Va. 358, 361 (2003), the standard is such that reasonable suspicion "need not rule out the possibility of innocent conduct," *United States v. Arvizu*, 534 U.S. 266, 277 (2002). To be sure, "the principal function of [the] investigation is to resolve that very ambiguity. . . to 'enable the

---

[9] The Commonwealth and the trial court have cited to our unpublished opinion in *Bonilla v. Commonwealth*, No. 0424-17-4 (Va. Ct. App. Feb. 20, 2018). While we take no issue with either the reasoning or the conclusion expressed in *Bonilla*, we do not rely on it in reaching a decision in this appeal. *See Kilpatrick v. Commonwealth*, 73 Va. App. 172, 195 n.9 (2021); *Brandau v. Brandau*, 52 Va. App. 632, 639 n.2 (2008) ("Unpublished opinions, of course, have no precedential value and thus do not implicate the interpanel accord doctrine.").

police to quickly determine whether they should allow the suspect to go about his business or hold him to answer charges.'" *Morris*, 58 Va. App. at 183 (quoting *Raab v. Commonwealth*, 50 Va. App. 577, 582 (2007) (*en banc*)).

In determining whether a police officer had the "minimal level of objective justification" to justify such a stop, we consider the totality of the circumstances, *Bland v. Commonwealth*, 66 Va. App. 405, 413 (2016), and "we eschew any 'divide-and-conquer analysis' that ignores the 'totality of the circumstances,'" *Shifflett v. Commonwealth*, 58 Va. App. 732, 740 (2011). In considering the circumstances of the stop, we consider a police officer's "experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Arvizu*, 534 U.S. at 273 (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)). Our analysis, however, is limited to the "facts available to the officer at the moment of the seizure," *Terry*, 392 U.S. at 21-22, and does not take into account information learned after the person has been detained.[10]

"Circumstances we have recognized as relevant . . . include characteristics of the area surrounding the stop, the time of the stop, the specific conduct of the suspect individual, the character of the offense under suspicion, and the unique perspective of a police officer trained and experienced in the detection of crime." *Walker v. Commonwealth*, 42 Va. App. 782, 791 (2004) (alteration in original) (quoting *Christian v. Commonwealth*, 33 Va. App. 704, 714 (2000) (*en banc*)). "The character of the location and the time at which a person is observed are relevant factors, but they do not supply a particularized and objective basis for suspecting criminal activity on the part of the particular person stopped." *McCain v. Commonwealth*, 275

---

[10] Critically, this excludes certain pieces of information from our review. The trial court found that Stroop only had heard the first BOLO at the time of the seizure, and therefore, did not know any of the information transmitted during the subsequent BOLO. Accordingly, any information he learned after the detention is irrelevant to our inquiry.

Va. 546, 552 (2008). Nonetheless, "[i]f a person matches the physical description of a criminal suspect, the police have reasonable suspicion to effect a *Terry* stop of that individual." *Brown v. Commonwealth*, 33 Va. App. 296, 307 (2000).

## IV. Application to this case

The question before us is whether the trial court erred in concluding that the facts known to Stroop when he encountered Turay were sufficient to provide Stroop with reasonable, articulable suspicion that he had been involved in criminal activity. Applying the appropriate standard of review, we conclude that the trial court did not err in so concluding.

Based on the totality of the evidence and Stroop's training and experience, the record supports the trial court's finding that Stroop possessed a reasonable, articulable suspicion of criminal activity to support the investigative stop of Turay. The evidence establishes that Stroop knew that three Black males wearing black had just committed an armed robbery and had left the crime scene on foot. Shortly after leaving the crime scene, Stroop encountered Turay and Carr walking within blocks of the crime scene. It was late on a cold night, and no one else was in the area. Stroop observed that the two men, both Black males, matched the description of the suspects that he had been provided and that Turay was wearing clothing similar to that described. As the trial court found, these circumstances were sufficient to initiate an investigatory stop: "[p]ut simply, 'police observation of an individual, fitting a police dispatch description of a person involved in a disturbance, near in time and geographic location to the disturbance establishes a reasonable suspicion that the individual is the subject of the dispatch.'" *United States v. Mitchell*, 963 F.3d 385, 391 (4th Cir. 2020) (quoting *United States v. Lenoir*, 318 F.3d 725, 729 (7th Cir. 2003)).

Turay's arguments to the contrary require no different result. Although the crime had been perpetrated by three men as opposed to just one or two, it was reasonable for Stroop to

- 10 -

conclude that a group of robbers might separate upon leaving the scene of their crime, either to help avoid detection or simply because they had differing destinations. Additionally, Stroop did not need to observe any specific suspicious conduct by Turay to stop him; Stroop's suspicion was sufficiently raised regarding Turay by his knowledge of the crime that had been committed and the description of the suspects he had been provided. Stroop also had no duty to follow-up with Lemons *prior to* detaining Turay; upon detaining him, Stroop radioed that he had stopped two suspects "matching the description" he had heard, and the responding investigating officers, including Lemons, arrived at his location within minutes.

Furthermore, Stroop could detain Turay even though Carr was not wearing any black clothing at the time. Turay and Carr appeared to be companions.[11] Both suspects were near the crime scene a short time after the offenses were committed. They matched the description of the suspects—two Black males and one of whom, Turay, was wearing a black jacket. It was reasonable for Stroop to believe that Turay and Carr were together and that a robbery suspect may discard potentially identifying clothing or attempt to change his appearance when he flees the crime scene.[12]

That it was possible that Turay was not part of the threesome that had perpetrated the crime does not dictate a different conclusion. As we previously have observed,

> [t]he Fourth Amendment does not require a policeman . . . to
> simply shrug his shoulders and allow . . . a criminal to escape. On
> the contrary, *Terry* recognizes that it may be the essence of good

---

[11] At oral argument Carr's counsel conceded that Carr and Turay were walking together.

[12] The fact that the clothing worn by Turay did not exactly match the original description communicated to Stroop is of no moment. He observed the supposedly armed suspects from his car in the dark of night; he testified on several occasions that, from his viewpoint, the two men matched the description he had received from dispatch. To the extent that he was not entirely correct, any mistake on his part was reasonable. "To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them fair leeway for enforcing the law in the community's protection." *Heien v. North Carolina,* 574 U.S. 54, 60-61 (2014) (internal quotation marks omitted).

> police work to adopt an intermediate response. A *brief stop* of a suspicious individual *in order to determine his identity or to maintain the status quo momentarily while obtaining more information,* may be most reasonable in light of the facts known to the officer at the time.

*Christian*, 33 Va. App. at 713 (first and second alterations in original) (quoting *Adams v. Williams*, 407 U.S. 143, 145-46 (1972)). Indeed, "[i]f the policeman were first required to verify all the circumstances of the crime, the opportunity to catch the criminal might be lost." *United States v. Moore*, 817 F.2d 1105, 1107 (4th Cir. 1987). Consequently, Turay's Fourth Amendment rights were not violated when Stroop detained him based on the information he had at the time, and the trial court did not err in denying his motion to suppress.

CONCLUSION

Because the detaining officer had reasonable, articulable suspicion to detain Turay, we conclude that the trial court did not err in denying his motion to suppress. Accordingly, we affirm the judgment of the trial court.

*Affirmed.*

Chaney, J., dissenting.

For the reasons expressed in the majority opinion in *Carr v. Commonwealth*, No. 1136-21-3 (Va. Ct. App. Oct 18, 2022), and incorporated herein, decided this day, I respectfully dissent.